(Slip Opinion) OCTOBER TERM, 2023 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CORNER POST, INC. *v.* BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 22–1008.   Argued February 20, 2024—Decided July 1, 2024

Since it opened for business in 2018, petitioner Corner Post, like most merchants, has accepted debit cards as a form of payment.  Debit card transactions require merchants to pay an "interchange fee" to the bank that issued the card.  The fee amount is set by the payment networks (such as Visa and MasterCard) that process the transaction.  In 2010 Congress tasked the Federal Reserve Board with making sure that interchange fees were "reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  15 U. S. C. §1693*o*–2(a)(3)(A).  Discharging this duty, in 2011 the Board published Regulation II, which sets a maximum interchange fee of $0.21 per transaction plus .05% of the transaction's value.

In 2021, Corner Post joined a suit brought against the Board under the Administrative Procedure Act (APA).  The complaint challenged Regulation II on the ground that it allows higher interchange fees than the statute permits.  The District Court dismissed the suit as time-barred under 28 U. S. C. §2401(a), the default six-year statute of limitations applicable to suits against the United States.  The Eighth Circuit affirmed.

*Held*: An APA claim does not accrue for purposes of §2401(a)'s 6-year statute of limitations until the plaintiff is injured by final agency action.  Pp. 4–23.

(a) The APA grants Corner Post a cause of action subject to certain conditions, see 5 U. S. C. §702 and §704, and 28 U. S. C. §2401(a) delineates the time period in which Corner Post may assert its claim.  Section 702 authorizes persons injured by agency action to obtain judicial review by suing the United States or one of its agencies, officers,

or employees.  See *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140–141.  The Court has explained that §702 "requir[es] a litigant to show, at the outset of the case, that he is injured in fact by agency action." *Director, Office of Workers' Compensation Programs* v. *Newport News Shipbuilding & Dry Dock Co.*, 514 U. S. 122, 127.  A litigant therefore cannot bring an APA claim unless and until she suffers an injury. While §702 equips injured parties with a cause of action, §704 provides that judicial review is available in most cases only for "final agency action."  *Bennett* v. *Spear*, 520 U. S. 154, 177–178.  Reading §702 and §704 together, a plaintiff may bring an APA claim only after she is injured by final agency action.

To determine whether Corner Post's APA claim is timely, the Court must interpret §2401(a), which provides that civil actions against the United States "shall be barred unless the complaint is filed within six years after the right of action first accrues."  The Board says an APA claim "accrues" under §2401(a) when agency action is "final" for purposes of §704; the claim can accrue for purposes of the statute of limitations even before the plaintiff suffers an injury.  The Court disagrees. A right of action "accrues" when the plaintiff has a "complete and present cause of action," which is when she has the right to "file suit and obtain relief."  *Green* v. *Brennan*, 578 U. S. 547, 554.  Because an APA plaintiff may not file suit and obtain relief until she suffers an injury from final agency action, the statute of limitations does not begin to run until she is injured.  Pp. 4–6.

(b) Congress enacted §2401(a) in 1948, two years after it enacted the APA.  Section 2401(a)'s predecessor was the statute-of-limitations provision for the Little Tucker Act, which provided for district court jurisdiction over certain claims against the United States.  When Congress revised and recodified the Judicial Code in 1948, it converted the Little Tucker Act's statute of limitations into §2401(a)'s general statute of limitations for all suits against the Government.  But Congress continued to start the statute of limitations period when the right "accrues." Compare 36 Stat. 1093 ("after the right accrued for which the claim is made") with §2401(a) ("after the right of action first accrues").

"Accrue" had a well-settled meaning in 1948, as it does now: A "right accrues when it comes into existence," *United States* v. *Lindsay*, 346 U. S. 568, 569—*i.e.*, "when the plaintiff has a complete and present cause of action," *Gabelli* v. *SEC*, 568 U. S. 442, 448.  This definition has appeared "in dictionaries from the 19th century up until today," which explain that a cause of action accrues when a suit may be maintained thereon.  568 U. S., at 448.  Thus, a cause of action does not become complete and present—it does not *accrue*—"until the plaintiff can file suit and obtain relief."  *Bay Area Laundry and Dry Cleaning*

*Pension Trust Fund* v. *Ferbar Corp. of Cal.*, 522 U. S. 192, 201.  Contemporaneous legal dictionaries explained that a claim does not "accrue" as soon as the defendant acts, but only after the plaintiff suffers the injury required to press her claim in court.

The Court's precedent treats this definition of accrual as the "standard rule for limitations periods," *Green*, 578 U. S., at 554, and the Court has "repeatedly recognized that Congress legislates against" this standard rule, *Graham County Soil & Water Conservation Dist.* v. *United States ex rel. Wilson*, 545 U. S. 409, 418.  Conversely, the Court has "reject[ed]" the possibility that a "limitations period commences at a time when the [plaintiff] could not yet file suit" as "inconsistent with basic limitations principles."  *Bay Area Laundry*, 522 U. S., at 200.  The Court will not reach such a conclusion "in the absence of any such indication in the text of the limitations period."  *Green*, 578 U. S., at 554.  Departing from the traditional rule is particularly inappropriate here because contemporaneous statutes demonstrate that Congress in 1948 knew how to create a limitations period that begins with the defendant's action instead of the plaintiff's injury.

The Board would have this Court interpret §2401(a) as a defendant-protective statute of repose that begins to run when agency action becomes final.  A statute of repose "puts an outer limit on the right to bring a civil action" that is "measured. . . from the date of the last culpable act or omission of the defendant."  *CTS Corp.* v. *Waldburger*, 573 U. S. 1, 8.  But §2401(a)'s plaintiff-focused language makes it a "statute of limitations," which—in contradistinction to statutes of repose—are "based on the date when the claim accrued."  *Id.*, at 7–8.  Pp. 6–10.

(c) The Board's arguments to the contrary lack merit.  Pp. 10–23.

(1) The Board points to the many specific statutory review provisions that start the clock at finality, contending that such statutes reflect a standard administrative-law practice of starting the limitations period when "any proper plaintiff" can challenge the final agency action.  But unlike the specific review provisions that the Board cites, §2401(a) does *not* refer to the date of the agency action's "entry" or "promulgat[ion]"; it says "right of action first accrues."  That textual difference matters.  The latter language reflects a statute of limitations and the former a statute of repose.  Moreover, the specific review provisions illustrate that Congress has sometimes employed the Board's preferred final-agency-action rule—but did not do so in §2401(a).  As the Court observed in *Rotkiske* v. *Klemm*, it is "particularly inappropriate" to read language into a statute of limitations "when, as here, Congress has shown that it knows how to adopt the omitted language or provision."  589 U. S. 8, 14.  Moreover, most of the finality-focused statutes that the Board cites came *after* §2401(a) was enacted in 1948.  These other, textually distinct statutes therefore do

not establish a background presumption that the limitations period for facial challenges to agency rules begins when the rule is final. Given the settled, plaintiff-centric meaning of "right of action first accrues" in 1948—not to mention in the Little Tucker Act before it—the Board cannot "displace" this "standard rule" for limitations periods. *Green*, 578 U. S., at 554.

While the Board argues that §2401(a) should not be interpreted to adopt a "challenger-by-challenger" approach, the standard accrual rule that §2401(a) exemplifies is *plaintiff specific*. The Board reads §2401(a) as if it says "the complaint is filed within six years after a̲ right of action [*i.e.*, *anyone's* right of action] first accrues"—which it does not say. Rather, §2401(a)'s text focuses on when the specific plaintiff had the right to sue: It says "*the* complaint is filed within six years after *the* right of action first accrues." (Emphasis added). And the Court has explained that the traditional accrual rule looks to when *the* plaintiff—this particular plaintiff—has a complete and present cause of action. See *Green*, 578 U. S., at 554. No precedent supports the Board's hypothetical "when could someone else have sued" sort of inquiry.

Importing the Board's special administrative-law rule into §2401(a) would create a defendant-focused rule for agency suits while retaining the traditional challenger-specific accrual rule for other suits against the United States. That would give the same statutory text—"right of action first accrues"—different meanings in different contexts, even though those words had a single, well-settled meaning when Congress enacted §2401(a). The Court "will not infer such an odd result in the absence of any such indication in the text of the limitations period." *Green*, 578 U. S., at 554. Pp. 10–16.

(2) The Board maintains that §2401(a)'s tolling provision—which provides that "[t]he action of any person under legal disability or beyond the seas at the time the claim accrues may be commenced within three years after the disability ceases"—"reflects Congress's understanding that a claim can 'accrue[]' for purposes of Section 2401(a)" even when a person is unable to sue. Brief for Respondent 24. While true, the tolling exception applies when the plaintiff *had* a complete and present cause of action after he was injured but his legal disability or absence from the country prevented him from bringing a timely suit. The exception sheds no light on when the clock started for Corner Post. P. 16.

(3) The Court's precedents in *Reading Co.* v. *Koons*, 271 U. S. 58, and *Crown Coat Front Co.* v. *United States*, 386 U. S. 503, do not support the Board's unusual interpretation of "accrual." In *Koons*, the Court held that a statutory wrongful-death claim accrued upon the

death of the employee, not on the appointment of an estate adminis-
trator, even though the latter was the "only person authorized by the
statute to maintain the action." *Koons*, 271 U. S., at 60. The Board
interprets *Koons* to hold that a claim accrued at a time when no plain-
tiff could sue, just as it says Corner Post's claim "accrued" before it
could sue. But in *Koons*, the beneficiaries on whose behalf any admin-
istrator would seek relief—the "real parties in interest"—had the right
to "procure the action" after the employee died. Given this unique con-
text, *Koons* does not contradict the proposition that a claim generally
accrues when the plaintiff has a complete and present cause of action.
Next, the Board relies on dicta in *Crown Coat* to support its contention
that the word "accrues" can take on different meanings in different
contexts. But the Board misreads *Crown Coat*, which did not suggest
that the words "right of action first accrues" *in a single statute* should
mean different things in different contexts. Instead, the Court inter-
preted §2401(a)—the very statute at issue here—to embody the tradi-
tional rule that a claim accrues when the plaintiff has the right to
bring suit in court. Pp. 16–20.

(4) Finally, the Board raises policy concerns. It emphasizes that
agencies and regulated parties need the finality of a 6-year cutoff, and
that successful facial challenges filed after six years upset the reliance
interests of those that have long operated under existing rules. But
"pleas of administrative inconvenience . . . never 'justify departing
from the statute's clear text.'" *Niz-Chavez* v. *Garland*, 593 U. S. 155,
169 (quoting *Pereira* v. *Sessions*, 585 U. S. 198, 217). Congress could
have chosen different language in §2401(a) or created a general statute
of repose for agencies, but it did not. In any event, the Board's policy
concerns are overstated because regulated parties may always chal-
lenge a regulation as exceeding the agency's statutory authority in en-
forcement proceedings against them. Moreover, there are significant
interests supporting the plaintiff-centric accrual rule, including the
APA's "basic presumption" of judicial review, *Abbott Labs.*, 387 U. S.,
at 140, and our "deep-rooted historic tradition that everyone should
have his own day in court," *Richards* v. *Jefferson County*, 517 U. S.
793, 798. Pp. 20–23.

55 F. 4th 634, reversed and remanded.

BARRETT, J., delivered the opinion of the Court, in which ROBERTS,
C. J., and THOMAS, ALITO, GORSUCH, and KAVANAUGH, JJ., joined.
KAVANAUGH, J., filed a concurring opinion. JACKSON, J., filed a dissenting
opinion, in which SOTOMAYOR, J., and KAGAN, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

———

No. 22–1008

———

## CORNER POST, INC., PETITIONER *v.* BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[July 1, 2024]

JUSTICE BARRETT delivered the opinion of the Court.

The default statute of limitations for suits against the United States requires "the complaint [to be] filed within six years after the right of action first accrues." 28 U. S. C. §2401(a). We must decide when a claim brought under the Administrative Procedure Act "accrues" for purposes of this provision. The answer is straightforward. A claim accrues when the plaintiff has the right to assert it in court—and in the case of the APA, that is when the plaintiff is injured by final agency action.

I

Corner Post is a truckstop and convenience store located in Watford City, North Dakota. It was incorporated in 2017, and in 2018, it opened for business. Like most merchants, Corner Post accepts debit cards as a form of payment. While convenient for customers, debit cards are costly for merchants: Every transaction requires them to pay an "interchange fee" to the bank that issued the card. The amount of the fee is set by the payment networks, like Visa and Mastercard, that process the transaction between

the banks of merchants and cardholders.  The cost quickly adds up.  Since it opened, Corner Post has paid hundreds of thousands of dollars in interchange fees—which has meant higher prices for its customers.

Interchange fees have long been a sore point for merchants.  For many years, payment networks had free rein over the fee amount—and because they used the promise of per-transaction profit to compete for the banks' business, they had significant incentive to raise the fees.  Merchants—who would lose customers if they declined debit cards—had little choice but to pay whatever the networks charged.  Left unregulated, interchange fees ballooned.

Congress eventually stepped in.  The Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 tasks the Federal Reserve Board with setting "standards for assessing whether the amount of any interchange transaction fee . . . is reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  124 Stat. 2068, 15 U. S. C. §1693*o*–2(a)(3)(A).  Discharging this duty, the Board promulgated Regulation II, which sets a maximum interchange fee of $0.21 per transaction plus .05% of the transaction's value.  See Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43394, 43420 (2011).  The Board published the rule on July 20, 2011.

Four months later, a group of retail-industry trade associations and individual retailers sued the Board, arguing that Regulation II allows costs that the statute does not.  See *NACS* v. *Board of Governors of FRS*, 958 F. Supp. 2d 85, 95–96 (DC 2013).  The District Court agreed, *id.*, at 99–109, but the D. C. Circuit reversed, concluding "that the Board's rules generally rest on reasonable constructions of the statute," *NACS* v. *Board of Governors of FRS*, 746 F. 3d 474, 477 (2014).

Corner Post, of course, did not exist when the Board

adopted Regulation II or even during the D. C. Circuit litigation. But after opening its doors, it too became frustrated by interchange fees, and in 2021, joined a suit brought against the Board under the Administrative Procedure Act (APA). The complaint alleges that Regulation II is unlawful because it allows payment networks to charge higher fees than the statute permits. See 5 U. S. C. §§706(2)(A), (C).

The District Court dismissed the suit as barred by 28 U. S. C. §2401(a), the applicable statute of limitations, 2022 WL 909317, *7–*9 (ND, Mar. 11, 2022), and the Eighth Circuit affirmed, *North Dakota Retail Assn.* v. *Board of Governors of FRS*, 55 F. 4th 634 (2022). Following other Circuits, it distinguished between "facial" challenges to a rule (like Corner Post's challenge to Regulation II) and challenges to a rule "as-applied" to a particular party. *Id.*, at 640–641. The Eighth Circuit held that "when plaintiffs bring a facial challenge to a final agency action, the right of action accrues, and the limitations period begins to run, upon publication of the regulation." *Id.*, at 641. On this view, §2401(a)'s 6-year limitations period began in 2011, when the Board published Regulation II, and expired in 2017, before Corner Post swiped its first debit card. See *id.*, at 643. Corner Post's suit was therefore too late.

The Eighth Circuit's decision deepened a circuit split over when §2401(a)'s statute of limitations begins to run for APA suits challenging agency action. At least six Circuits now hold that the limitations period for "facial" APA challenges begins on the date of final agency action—*e.g.*, when the rule was promulgated—regardless of when the plaintiff was injured. See, *e.g.*, *id.*, at 641; *Wind River Min. Corp.* v. *United States*, 946 F. 2d 710, 715 (CA9 1991); *Dunn-McCampbell Royalty Interest, Inc.* v. *National Park Serv.*, 112 F. 3d 1283, 1287 (CA5 1997); *Harris* v. *FAA*, 353 F. 3d 1006, 1009–1010 (CADC 2004); *Hire Order Ltd.* v. *Marianos*, 698 F. 3d 168, 170 (CA4 2012); *Odyssey Logistics & Tech. Corp.* v. *Iancu*, 959 F. 3d 1104, 1111–1112 (CA Fed.

2020). By contrast, the Sixth Circuit has stated a generally applicable rule that §2401(a)'s limitations period begins when the plaintiff is injured by agency action, even if that injury did not occur until many years after the action became final. *Herr* v. *United States Forest Serv.*, 803 F. 3d 809, 820–822 (2015) ("When a party first becomes aggrieved by a regulation that exceeds an agency's statutory authority more than six years after the regulation was promulgated, that party may challenge the regulation without waiting for enforcement proceedings" (emphasis deleted)). We granted certiorari to resolve the split. 600 U. S. ___ (2023).

## II

Three statutory provisions control our analysis: 5 U. S. C. §702 and §704, the relevant APA provisions, and 28 U. S. C. §2401(a), the relevant statute of limitations. The APA provisions grant Corner Post a cause of action subject to certain conditions, and §2401(a) sets the window within which Corner Post can assert its claim.

Section 702 authorizes persons injured by agency action to obtain judicial review by suing the United States or one of its agencies, officers, or employees. See *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140–141 (1967). It provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U. S. C. §702. We have explained that §702 "requir[es] a litigant to show, at the outset of the case, that he is injured in fact by agency action." *Director, Office of Workers' Compensation Programs* v. *Newport News Shipbuilding & Dry Dock Co.*, 514 U. S. 122, 127 (1995). Thus, a litigant cannot bring an APA claim unless and until she suffers an injury.[1]

--------

[1] The dissent asserts that §702 "restricts *who* may challenge agency

While §702 equips injured parties with a cause of action, §704 limits the agency actions that are subject to judicial review. Unless another statute makes the agency's action reviewable (and none does for Regulation II), judicial review is available only for "final agency action." §704. In most cases, then, a plaintiff can only challenge an action that "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett* v. *Spear*, 520 U. S. 154, 177–178 (1997) (internal quotation marks omitted). Note that §702's injury requirement and §704's finality requirement work hand in hand: Each is a "necessary, but not by itself . . . sufficient, ground for stating a claim under the APA." *Herr*, 803 F. 3d, at 819.

The applicable statute of limitations, 28 U. S. C. §2401(a), contains the language we must interpret: "[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years *after the right of action first accrues*." (Emphasis added.) This provision applies generally to suits against the United States unless the timing provision of a more specific statute displaces it. See, *e.g.*, 33 U. S. C. §1369(b) (deadline to challenge certain agency actions under the Clean Water Act).

The Board contends that an APA claim "accrues" when agency action is "final" for purposes of §704—injury, it says,

———————

action," yet its injury requirement "says nothing about" the cause of action or elements of the claim. *Post*, at 16. But surely the dissent does not mean to suggest that an *uninjured* person may bring an APA claim. Whether one calls injury a restriction on who may sue or an element of the cause of action, the relevant, undisputed point is that a plaintiff cannot sue under the APA unless she is "injured in fact by agency action." *Newport News*, 514 U. S., at 127.

is necessary for the suit but irrelevant to the statute of limitations.[2]  We disagree.  A right of action "accrues" when the plaintiff has a "complete and present cause of action"—*i.e.*, when she has the right to "file suit and obtain relief."  *Green* v. *Brennan*, 578 U. S. 547, 554 (2016) (internal quotation marks omitted).  An APA plaintiff does not have a complete and present cause of action until she suffers an injury from final agency action, so the statute of limitations does not begin to run until she is injured.

## III

Congress enacted §2401(a) in 1948, two years after it enacted the APA.  See 62 Stat. 971.  Section 2401(a)'s predecessor was the statute-of-limitations provision for the Little Tucker Act, which gave district courts jurisdiction over non-tort monetary claims not exceeding $10,000 against the United States.  See §24, 36 Stat. 1093 ("That no suit against the Government of the United States shall be allowed under this paragraph unless the same shall have been brought within six years after the right accrued for which the claim is made"); Brief for Professor Aditya Bamzai et al. as *Amici Curiae* 5–6.  When Congress revised and recodified the Judicial Code in 1948, it converted the Little Tucker Act's statute of limitations into a general statute of limitations for all

---

[2] The Board leaves open the possibility that someone could bring an as-applied challenge to a rule when the agency relies on that rule in enforcement proceedings against that person, even if more than six years have passed since the rule's promulgation.  But Corner Post, as a merchant rather than a payment network, is not regulated by Regulation II—so it will never be the target of an enforcement action in which it could challenge that rule.  JUSTICE KAVANAUGH asserts that "Corner Post can obtain relief in this case only because the APA authorizes vacatur of agency rules."  *Post*, at 1 (concurring opinion).  Whether the APA authorizes vacatur has been subject to thoughtful debate by Members of this Court.  See, *e.g.*, *United States* v. *Texas*, 599 U. S. 670, 693–702 (2023) (GORSUCH, J., concurring in judgment).  We took this case only to decide how §2401(a)'s statute of limitations applies to APA claims.  We therefore assume without deciding that vacatur is available under the APA.

suits against the Government—replacing "under this paragraph" with "every civil action against the United States." But Congress continued to start the 6-year limitations period when the right "accrues." Compare 36 Stat. 1093 ("after the right accrued for which the claim is made") with §2401(a) ("after the right of action first accrues").

In 1948, as now, "accrue" had a well-settled meaning: A "right accrues when it comes into existence," *United States* v. *Lindsay*, 346 U. S. 568, 569 (1954)—*i.e.*, "'when the plaintiff has a complete and present cause of action,'" *Gabelli* v. *SEC*, 568 U. S. 442, 448 (2013) (quoting *Wallace* v. *Kato*, 549 U. S. 384, 388 (2007)). This definition has appeared "in dictionaries from the 19th century up until today." *Gabelli*, 568 U. S., at 448. Legal dictionaries in the 1940s and 1950s uniformly explained that a cause of action "'accrues' when a suit may be maintained thereon." Black's Law Dictionary 37 (4th ed. 1951) (Black's); see also, *e.g.*, Ballentine's Law Dictionary 15–16 (2d ed. 1948) (Ballentine's) ("[A]ccrual of cause of action" defined as the "coming or springing into existence of a right to sue" (boldface deleted)). Thus, we have explained that a cause of action "does not become 'complete and present' for limitations purposes"—it does not *accrue*— "until the plaintiff can file suit and obtain relief." *Bay Area Laundry and Dry Cleaning Pension Trust Fund* v. *Ferbar Corp. of Cal.*, 522 U. S. 192, 201 (1997).

Importantly, contemporaneous dictionaries also explained that a cause of action accrues "on [the] date that damage is sustained and not [the] date when causes are set in motion which ultimately produce injury." Black's 37. "[I]f an act is not legally injurious until certain consequences occur, it is not the mere doing of the act that gives rise to a cause of action, but the subsequent occurrence of damage or loss as the consequence of the act, and *in such case no cause of action accrues until the loss or damage occurs*." Ballentine's 16 (emphasis added). Thus, when Congress used the phrase "right of action first accrues" in

§2401(a), it was well understood that a claim does not "accrue" as soon as the defendant acts, but only after the plaintiff suffers the injury required to press her claim in court.

Our precedent treats this definition of accrual as the "standard rule for limitations periods." *Green*, 578 U. S., at 554. "We have repeatedly recognized that Congress legislates against the 'standard rule that the limitations period commences when the plaintiff has a complete and present cause of action.'" *Graham County Soil & Water Conservation Dist.* v. *United States ex rel. Wilson*, 545 U. S. 409, 418 (2005) (quoting *Bay Area Laundry*, 522 U. S., at 201). It is "unquestionably the traditional rule" that "[a]bsent other indication, a statute of limitations begins to run at the time the plaintiff 'has the right to apply to the court for relief.'" *TRW Inc.* v. *Andrews*, 534 U. S. 19, 37 (2001) (Scalia, J., concurring in judgment) (quoting 1 H. Wood, Limitation of Actions §122a, p. 684 (rev. 4th ed. 1916) (Wood)). Conversely, we have "reject[ed]" the possibility that a "limitations period commences at a time when the [plaintiff] could not yet file suit" as "inconsistent with basic limitations principles." *Bay Area Laundry*, 522 U. S., at 200.

This traditional rule constitutes a strong background presumption. While the "standard rule can be displaced such that the limitations period begins to run before a plaintiff can file a suit," we "'will not infer such an odd result in the absence of any such indication' in the text of the limitations period." *Green*, 578 U. S., at 554 (quoting *Reiter* v. *Cooper*, 507 U. S. 258, 267 (1993)). "Unless Congress has told us otherwise in the legislation at issue, a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief." *Bay Area Laundry*, 522 U. S., at 201.

There is good reason to conclude that Congress codified the traditional accrual rule in §2401(a). Nothing "in the text of [§2401(a)'s] limitations period" gives any indication that it begins to run before the plaintiff has a complete and

present cause of action. *Green*, 578 U. S., at 554. Rather, §2401(a) uses standard language that had a well-settled meaning in 1948: "right of action first accrues." Moreover, Congress knew how to depart from the traditional rule to create a limitations period that begins with the defendant's action instead of the plaintiff's injury: Just six years before it enacted §2401(a), Congress passed the Emergency Price Control Act of 1942, which required challenges to Office of Price Administration actions to be filed "[w]ithin a period of sixty days *after the issuance of any regulation or order*." §203(a), 56 Stat. 31 (emphasis added); see also Administrative Orders Review Act (Hobbs Act), §4, 64 Stat. 1130 (1950) (allowing petitions for review "within sixty days after entry of" a "final order reviewable under this Act"). Section 2401(a), by contrast, stuck with the standard accrual language.

Section 2401(a) thus operates as a statute of limitations rather than a statute of repose. "[A] statute of limitations creates 'a time limit for suing in a civil case, based on the date when the claim accrued.'" *CTS Corp.* v. *Waldburger*, 573 U. S. 1, 7–8 (2014) (quoting Black's 1546 (9th ed. 2009)). That describes §2401(a), with its reference to when the right of action "accrues," to a tee. "A statute of repose, on the other hand, puts an outer limit on the right to bring a civil action" that is "measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant." 573 U. S., at 8. Such statutes bar "'any suit that is brought after a specified time since the defendant acted . . . even if this period ends before the plaintiff has suffered a resulting injury.'" *Ibid.* (quoting Black's 1546). That describes statutes like the Hobbs Act, which sets a filing deadline of 60 days from the "entry" of the agency order. 64 Stat. 1130. Statutes of limitations "require plaintiffs to pursue diligent prosecution of known claims"; statutes of repose reflect a "legislative judgment that a defendant should be free from liability after the

legislatively determined period of time." *CTS Corp.*, 573 U. S., at 8–9 (internal quotation marks omitted).[3] The Board asks us to interpret §2401(a) as a defendant-protective statute of repose that begins to run when agency action becomes final. But §2401(a)'s plaintiff-focused language makes it an accrual-based statute of limitations.

\*    \*    \*

Section 2401(a) embodies the plaintiff-centric traditional rule that a statute of limitations begins to run only when the plaintiff has a complete and present cause of action. Because injury, not just finality, is required to sue under the APA, Corner Post's cause of action was not complete and present until it was injured by Regulation II. Therefore, its suit is not barred by the statute of limitations.

## IV

The Board concedes that some claims accrue for purposes of §2401(a) when the plaintiff has a complete and present cause of action—in other words, it admits that "accrue" carries its usual meaning for some claims. But it argues that facial challenges to agency rules are different, accruing when agency action is final rather than when the plaintiff can assert her claim. See also *post*, at 5–6 (JACKSON, J., dissenting). The Board raises several arguments to support its position, but none work.

## A

The Board puts the most weight on the many specific statutory review provisions that start the clock at finality. See also *post*, at 12–15 (JACKSON, J., dissenting). The

---

[3] Perplexingly, the dissent rejects this distinction, *post*, at 10–11, even though our precedent clearly recognizes it: *CTS Corp.* acknowledged the "substantial overlap between the policies of the two types of statute" but concluded nonetheless that "each has a distinct purpose and each is targeted at a different actor." 573 U. S., at 8.

Hobbs Act, for example, requires persons aggrieved by certain final orders and regulations of the Federal Communications Commission, Secretary of Agriculture, and Secretary of Transportation, among others, to petition for review "within 60 days after [the] entry" of the final agency action. 28 U. S. C. §§2342, 2344; see also, *e.g.*, 29 U. S. C. §655(f) (suits challenging Occupational Safety and Health Administration standards must be filed "prior to the sixtieth day after such standard is promulgated"). The Board contends that such statutes reflect a standard administrative-law practice of starting the limitations period when "any proper plaintiff" can challenge the final agency action. Brief for Respondent 9. There is "no sound basis," it insists, "for instead applying a challenger-by-challenger approach to calculate the limitations period on APA claims." *Ibid.*; see also *post*, at 9–10 (JACKSON, J., dissenting).

1

This argument hits the immutable obstacle of §2401(a)'s text. Unlike the specific review provisions that the Board cites, §2401(a) does *not* refer to the date of the agency action's "entry" or "promulgat[ion]"; it says "right of action first accrues." That textual difference matters. To begin, the latter language reflects a statute of limitations and the former a statute of repose. Moreover, the specific review provisions actually undercut the Board's argument, because they illustrate that Congress has sometimes employed the Board's preferred final-agency-action rule—but did not do so in §2401(a). As we observed in *Rotkiske* v. *Klemm*, it is "particularly inappropriate" to read language into a statute of limitations "when, as here, Congress has shown that it knows how to adopt the omitted language or provision." 589 U. S. 8, 14 (2019).

In arguing to the contrary, *post*, at 12–16, the dissent ignores the textual differences between §2401(a) and finality-

focused specific review provisions—flouting *Rotkiske*'s admonition to heed such distinctions. According to the dissent, we cannot expect "Congress to have explicitly stated that accrual in §2401(a) starts at the point of final agency action when §2401(a) is a residual provision" that applies generally. *Post*, at 15. But §2401(a)'s text reflects a choice: Congress took the Little Tucker Act's plaintiff-focused limitations period—which began when "the right accrued for which the claim is made," 36 Stat. 1093—and made it generally applicable to "every" suit against the United States, §2401(a); see Part III, *supra*. Congress could have created a separate residual provision for suits challenging agency action and pegged its limitations period to the moment of finality, using statutes like the Emergency Price Control Act as a model. It chose a different path.

Undeterred, the dissent insists that by the time §2401(a) was enacted, Congress had "uniformly expressed [a] judgment" that the limitations period for agency suits should be defendant-centric and start with finality. *Post*, at 14. Again, this argument disregards §2401(a)'s text in favor of alleged congressional intent divined from *other* statutes with very different language. "As this Court has repeatedly stated, the text of a law controls over purported legislative intentions unmoored from any statutory text"; the Court "may not 'replace the actual text with speculation as to Congress' intent.'" *Oklahoma* v. *Castro-Huerta*, 597 U. S. 629, 642 (2022) (quoting *Magwood* v. *Patterson*, 561 U. S. 320, 334 (2010)).

In any event, the dissent misunderstands the history. See *post*, at 14, and n. 6. (Notably, the Board itself does not make this argument.) While the Emergency Price Control Act of 1942 preceded the APA (1946) and §2401(a) (1948), most finality-focused limitations provisions, like the Hobbs Act (1950), came later. See *post*, at 12–13, and n. 5; *e.g.*, 5 U. S. C. §7703(b)(1) (added by 92 Stat. 1143 (1978)). To conjure its supposed backdrop, the dissent cites a hodgepodge

of other pre-1948 statutes that started the clock at finality. *Post*, at 14, n. 6. But these statutes generally governed challenges to orders adjudicating a party's own rights— what we today might call "as-applied" challenges. For example, 7 U. S. C. §194(a) provided a 30-day limitations period for a meatpacker to appeal an order finding that the packer "has violated or is violating any provision" of the statute regulating business practices in the meatpacking industry. 42 Stat. 161–162; see also, *e.g.*, 15 U. S. C. §45(c) (persons required by a Federal Trade Commission order to cease a business practice may obtain review of that order within 60 days). Statutes like these do not contradict the plaintiff-centric standard accrual rule, because a party subject to such an order suffers legally cognizable injury at the same time that the order becomes final.[4]

Thus, even if the "intention" Congress "expressed" in textually distinct statutes could overcome §2401(a)'s language, *post*, at 14, the dissent's history would not support its supposed background presumption—that the limitations period for facial challenges to regulations begins when the rule becomes final even if the plaintiff does not yet have a complete and present cause of action. Instead, the best course, as always, is to stick with the ordinary meaning of the text that actually applies, §2401(a). Given the settled, plaintiff-centric meaning of "right of action first accrues" in

—————

[4] There is another reason to doubt the dissent's supposed background limitations principle for facial challenges to agency rules: In the 1940s, "most administrative activity was adjudicative in nature"; agencies "rarely, if ever, adopted sweeping regulations." K. Hickman & R. Pierce, 1 Administrative Law §1.3, p. 26 (7th ed. 2024). The dissent errs by extrapolating a general congressional intent that all agency suits be subject to a finality-based limitations rule based on pre-1948 statutes that governed a subset of agency actions—adjudicative orders—and were enacted before facial challenges to regulations became common. It is hard to see how provisions governing when a party may challenge an order adjudicating her own rights could set any kind of background rule for facial APA challenges to generally applicable regulations.

1948—not to mention in the Little Tucker Act—the dissent cannot "displace" this "standard rule" with scattered citations to different, inapposite statutes. *Green*, 578 U. S., at 554.

2

The standard accrual rule that §2401(a)'s limitations period exemplifies is *plaintiff specific*—even if repose provisions like the Hobbs Act eschew a "challenger-by-challenger" approach. Brief for Respondent 9. The Board's rule would start the limitations period applicable to the plaintiff not when *she* had a complete and present cause of action but when the agency action was final and, theoretically, some *other* plaintiff was injured and could have sued. But §2401(a)'s text focuses on a specific plaintiff: "*the* complaint is filed within six years after *the* right of action first accrues." (Emphasis added.)

The dissent disputes §2401(a)'s plaintiff specificity by pointing out that it does not say "*the plaintiff's* right of action first accrues." *Post*, at 9. True, but it does use the definite article "the" to link "*the* complaint" with "*the* right of action." So the most natural interpretation is that its limitations period begins when *the cause of action associated with the complaint*—the plaintiff's cause of action—is complete. And while the dissent cites dictionary definitions of "accrue" that mention "'*a* right to sue,'" *ibid.*, the statute's use of the definite article "the" takes precedence. The Board and the dissent read §2401(a) as if it says "the complaint is filed within six years after a right of action [*i.e.*, *anyone's* right of action] first accrues"—which, of course, it does not.

In fact, we have explained that the traditional accrual rule looks to when "*the* plaintiff"—this particular plaintiff—"has a complete and present cause of action." *Green*, 578 U. S., at 554 (internal quotation marks omitted; emphasis added). No precedent suggests that the traditional rule contemplates the Board's hypothetical "when could

Cite as: 603 U. S. \_\_\_\_ (2024)

Opinion of the Court

someone else have sued" sort of inquiry.[5] Rather, the "stat-
ute of limitations begins to run at the time *the plaintiff* has
the right to apply to the court for relief." *TRW Inc.*, 534
U. S., at 37 (opinion of Scalia, J.) (internal quotation marks
omitted; emphasis added).[6]

Importing the Board's special administrative-law rule
into §2401(a) would create a defendant-focused rule for
agency suits while retaining the traditional challenger-
specific accrual rule for other suits against the United
States. That would give the same statutory text—"right of
action first accrues"—different meanings in different con-
texts, even though those words had a single, well-settled
meaning when Congress enacted §2401(a). See Part III, *su-
pra*. The Board's interpretation would thereby decouple the
statute of limitations from any injury "such that the limita-
tions period begins to run before a plaintiff can file a suit"—
for *some*, *but not all*, suits governed by §2401(a). *Green*, 578
U. S., at 554. We "will not infer such an odd result in the

——————

[5] While the dissent attempts to cabin our precedent describing the
plaintiff-specific standard accrual rule, nothing in those cases suggests
that the rule is only plaintiff-specific for "plaintiff-specific causes of ac-
tion." *Post*, at 10; see, *e.g.*, *Gabelli* v. *SEC*, 568 U. S. 442, 448 (2013) (The
"'standard rule'" that a "claim accrues 'when the plaintiff has a complete
and present cause of action'" has "governed since the 1830s" and "ap-
pears in dictionaries from the 19th century up until today"). And regard-
less, the dissent's assertion that "administrative-law claims" are *not*
"plaintiff specific," *post*, at 6, is mystifying given that an APA plaintiff
cannot sue until *she* suffers an injury, see 5 U. S. C. §702; n. 1, *supra*. By
emphasizing the plaintiff-agnostic aspects of facial challenges to agency
action, *post*, at 10, 16–18, the dissent conflates the defendant-focused
*substance* of an APA claim with its plaintiff-specific *cause of action*.

[6] Moreover, there may be cases where *no one* is injured and able to sue
at the time of final agency action—*e.g.*, if the agency delays a rule's en-
forcement—but the Board would still start the clock then. Cf. *Toilet
Goods Assn., Inc.* v. *Gardner*, 387 U. S. 158, 162–166 (1967) (agency rule
was final but challenge was not yet ripe). So the Board's position cannot
be reconciled even with a challenger-agnostic form of the traditional ac-
crual rule, which at least would require that *someone* have a complete
and present cause of action before the limitations period begins.

absence of any such indication in the text of the limitations period." *Ibid.* (internal quotation marks omitted).

## B

Turning to §2401(a)'s text, the Board draws significance from this sentence: "The action of any person under legal disability or beyond the seas at the time the claim accrues may be commenced within three years after the disability ceases." This language, the Board stresses, "necessarily reflects Congress's understanding that a claim can 'accrue[]' for purposes of Section 2401(a)" even when a person is unable to sue. Brief for Respondent 24. True enough. It is a mystery, however, why the Board finds this helpful. The tolling exception applies when the plaintiff *had* a complete and present cause of action after he was injured but his legal disability or absence from the country "prevent[ed] him from bringing a timely suit." *Goewey* v. *United States*, 222 Ct. Cl. 104, 113, 612 F. 2d 539, 544 (1979) (*per curiam*). What matters for accrual is when the plaintiff had "the *right* to apply to the court for relief," not whether some external impediment prevented her from doing so. Wood §122a, at 684 (emphasis added). The exception, therefore, sheds no light on when the clock started ticking for Corner Post—but it does show Congress's concern for plaintiffs who might lose a cause of action through no fault of their own.

## C

The Board also leans on our precedent—namely, *Reading Co.* v. *Koons*, 271 U. S. 58 (1926), and *Crown Coat Front Co.* v. *United States*, 386 U. S. 503 (1967)—to support its unusual interpretation of "accrual." See also *post*, at 6–9 (JACKSON, J., dissenting). Again, the Board comes up empty.

In *Koons*, we interpreted the statute of limitations under the Federal Employers' Liability Act, which barred actions

brought more than two years after "'the cause of action accrued.'" 271 U. S., at 60 (quoting ch. 149, §6, 35 Stat. 66). We held that the plaintiff's wrongful-death claim accrued when the employee died, even though the estate's administrator was not appointed until later and the administrator was "the only person authorized by the statute to maintain the action." 271 U. S., at 60. The Board interprets *Koons* to hold that a claim accrued at a time when no plaintiff could sue. Thus, the Board reasons, it is consistent with the meaning of "accrue" to say that Corner Post's claim "accrued" before it could sue.

The Board's characterization of *Koons* is incomplete. *Koons* explained that the administrator "acts only for the benefit of persons specifically designated in the statute," and at the "time of death there are identified persons for whose benefit the liability exists and who can start the machinery of the law in motion to enforce it, by applying for the appointment of an administrator." *Id.*, at 62. If a beneficiary sued in her individual capacity immediately after the employee's death, she could amend her suit to describe herself as "executor or administrator of the decedent." *Ibid.* So "at the death of decedent, there are real parties in interest who may procure the action to be brought." *Id.*, at 62–63. While it is true that the claim accrued before any particular administrator was appointed, the beneficiaries on whose behalf any administrator would seek relief—the "real parties in interest"—had the right to "procure the action" after the employee died. Given this unique context, *Koons* does not contradict the proposition that a claim generally accrues when the plaintiff has a complete and present cause of action.

Nor does *Crown Coat*. That case concerned a contract dispute in which a Government contractor sought an equitable adjustment to the payment it received. 386 U. S., at 507. The contract required the contractor to present its claim to the contracting officer and Armed Services Board

of Contract Appeals; its claim was "not subject to adjudication in the courts" until it was denied by the Board. *Id.*, at 511. The question presented was whether §2401(a)'s statute of limitations began to run when the Board issued its final determination or at an earlier date. *Id.*, at 507.

We held that the right of action first accrued when the Board denied the contractor's claim, because the contractor had "the right to resort to the courts only upon the making of that administrative determination." *Id.*, at 512. We explained that §2401(a)'s phrase "right of action" refers to "the right to file a civil action in the courts against the United States." *Id.*, at 511. Given the contract's administrative-exhaustion requirement, "the contractor's claim was subject only to administrative, not judicial, determination in the first instance"; the plaintiff was "not legally entitled to ask the courts to adjudicate [its] claim as an original matter." *Id.*, at 511–512, 515. So its "claim or right to bring a civil action against the United States" did not "matur[e]" until the Board made its final decision. *Id.*, at 514. *Crown Coat* thus supports Corner Post: The Court interpreted §2401(a) to embody the traditional rule that a claim accrues when the plaintiff has the right to bring suit in court.

Notwithstanding *Crown Coat*'s holding, the Board and the dissent try to marshal support from its dicta. The Court noted that it is hazardous "to define for all purposes when a 'cause of action' first 'accrues'"; it cautioned that those words should be "'interpreted in the light of the general purposes of the statute and of its other provisions'" and the "'practical ends'" served by time limitations. *Id.*, at 517 (quoting *Koons*, 271 U. S., at 62). Seizing on this language, the Board insists that the word "accrues" is a chameleon, taking on different meanings in different contexts—and in the administrative-law context, a right of action "accrues" when a regulation is final, full stop. See also *post*, at 6 (JACKSON, J., dissenting) (citing *Crown Coat* for the proposition that "the word 'accrues' lacks any fixed meaning").

The Board and the dissent vastly overread—in fact, they misread—*Crown Coat*. The Court did not suggest that the same words "right of action first accrues" *in a single statute* should mean different things in different contexts—which is how the Board and the dissent would have us interpret §2401(a). Rather, the Court made its observation in the course of distinguishing §2401(a) from a statutory scheme that departed from the traditional accrual rule.[7] 386 U. S., at 516–517. Moreover, as we have already explained, the Court interpreted §2401(a)—the very statute at issue in this case—to start the clock when the plaintiff is "legally entitled" to file suit. *Id.*, at 515. It also specifically rejected the Government's position that the time can run even before a plaintiff's "civil action against the United States matures." *Id.*, at 514; see also *ibid.* (noting that the Government's position "would have unfortunate impact"). We therefore do not read *Crown Coat*'s "general purposes" language to contradict either its holding or the "'standard rule'" for limitations periods." *Green*, 578 U. S., at 554.

Even if *Crown Coat*'s dicta supported sapping "accrues" of any "fixed meaning," *post*, at 6 (JACKSON, J., dissenting), this approach has been contravened by the weight of subse-

———————
[7] The Court distinguished the limitations scheme at issue in *McMahon* v. *United States*, 342 U. S. 25 (1951). That scheme involved two statutes: one requiring "actions to be brought within two years after 'the cause of action arises'" and another "permit[ting] court action only if the claim ha[d] been administratively disallowed, but set[ting] no time within which a claim must be presented to the administrative body." *Crown Coat*, 386 U. S., at 516–517. The *McMahon* Court held that the claim accrued not after the administrative disallowance that would enable the plaintiff to sue in court, but at the time of the plaintiff's earlier injury. 342 U. S., at 27. *Crown Coat* attributed this holding to the unique two-statute context: "[P]ostpon[ing] the usual time of accrual of the cause of action [*i.e.*, the time of injury] until the date of disallowance" would have "permit[ted] the claimant to postpone indefinitely the commencement of the running of the statutory period." 386 U. S., at 517; see *McMahon*, 342 U. S., at 27.

quent precedent.  Our limitations cases from the last several decades have instead emphasized the strength of the traditional, plaintiff-centric accrual rule and demanded that departures be justified by the statutory "text of the limitations period."  *Green*, 578 U. S., at 554; see also, *e.g.*, *Graham County*, 545 U. S., at 418–419 (explaining that in *Reiter* v. *Cooper*, 507 U. S., at 267, the Court "declin[ed] to countenance the 'odd result' that a federal cause of action and statute of limitations arise at different times 'absen[t] . . . any such indication in the statute'"); *Bay Area Laundry*, 522 U. S., at 201.

## D

Finally, the Board raises policy concerns.  It emphasizes that agencies and regulated parties need the finality of a 6-year cutoff.  After that point, facial challenges impose significant burdens on agencies and courts.  Moreover, if they are successful, such challenges upset the reliance interests of the agencies and regulated parties that have long operated under existing rules.  See also *post*, at 18–24 (JACKSON, J., dissenting).

"[P]leas of administrative inconvenience . . . never 'justify departing from the statute's clear text.'"  *Niz-Chavez* v. *Garland*, 593 U. S. 155, 169 (2021) (quoting *Pereira* v. *Sessions*, 585 U. S 198, 217 (2018)).  Congress could have chosen different language in §2401(a) or created a general statute of repose for agencies.  It did not.

That is enough to dispatch the Board's policy arguments, but we add that its concerns are overstated.  Put aside facial challenges like Corner Post's.  Regulated parties "may always assail a regulation as exceeding the agency's statutory authority in enforcement proceedings against them" or "petition an agency to reconsider a longstanding rule and then appeal the denial of that petition."  *Herr*, 803 F. 3d, at 821–822.  So even on the Board's preferred interpretation, "[a] federal regulation that makes it six years without being

contested does not enter a promised land free from legal challenge." *Id.*, at 821. Likewise, the dissent imagines an alternative reality of total finality that simply does not exist. See *post*, at 21–23.

Moreover, the opportunity to challenge agency action does not mean that new plaintiffs will always win or that courts and agencies will need to expend significant resources to address each new suit. Given that major regulations are typically challenged immediately, courts entertaining later challenges often will be able to rely on binding Supreme Court or circuit precedent. If neither this Court nor the relevant court of appeals has weighed in, a court may be able to look to other circuits for persuasive authority. And if no other authority upholding the agency action is persuasive, the court may have more work to do, but there is all the more reason for it to consider the merits of the newcomer's challenge.[8]

Turning to the other side of the policy ledger, the Board slights the arguments supporting the plaintiff-centric accrual rule. In addition to being compelled by §2401(a)'s text, this rule vindicates the APA's "basic presumption" that anyone injured by agency action should have access to judicial review. *Abbott Labs.*, 387 U. S., at 140. It also respects our "deep-rooted historic tradition that everyone

_____

[8] It also may be that some injuries can only be suffered by entities that existed at the time of the challenged action. Corner Post suggests that only parties that existed during the rulemaking process can claim to have been injured by a "procedural" shortcoming, like a deficient notice of proposed rulemaking. Reply Brief 18–19. We need not resolve that issue here because there is no dispute that Corner Post proffered an injury that does not depend on its having existed when the Board promulgated Regulation II: the rule's alleged conflict with the Durbin Amendment. The dissent's observation that "the claims in this case *are* procedural," *post*, at 18, is confused. Even if some of Corner Post's claims might be procedural, its central claim—that the regulation violates the statute—is a prototypical substantive challenge.

should have his own day in court." *Richards* v. *Jefferson County*, 517 U. S. 793, 798 (1996) (internal quotation marks omitted). Under the Board's finality rule, only those fortunate enough to suffer an injury within six years of a rule's promulgation may bring an APA suit. Everyone else—no matter how serious the injury or how illegal the rule—has no recourse.[9]

The dissent also raises a host of policy arguments masquerading as "matter[s] of congressional intent." *Post*, at 18–24. And it warns that today's opinion will "devastate the functioning of the Federal Government." *Post*, at 23. This claim is baffling—indeed, bizarre—in a case about a statute of limitations. The Solicitor General, whose mandate is to protect the interests of the Federal Government, comes nowhere close to suggesting that a plaintiff-centric interpretation of §2401(a) spells the end of the United States as we know it. Perhaps the dissent believes that the Code of Federal Regulations is full of substantively illegal regulations vulnerable to meritorious challenges; or perhaps it believes that meritless challenges will flood federal courts that are too incompetent to reject them. We have more confidence in both the Executive Branch and the Judiciary. But we do agree with the dissent on one point: "'[T]he ball is in Congress' court.'" *Post*, at 24 (quoting *Ledbetter* v. *Goodyear Tire & Rubber Co.*, 550 U. S. 618, 661 (2007) (Ginsburg, J., dissenting)). Section 2401(a) is 75 years old. If it is a poor fit for modern APA litigation, the

---

[9] Corner Post has no other way to obtain meaningful review of Regulation II. Because Regulation II does not directly regulate it, it will never be subject to enforcement actions in which it may challenge the rule's legality. See n. 2, *supra.* Nor is the ability to petition the Board for rulemaking to change Regulation II a sufficient substitute for *de novo* judicial review of its lawfulness: The agency's "discretionary decision to decline to take new action" would be subject only to "deferential judicial review." *PDR Network, LLC* v. *Carlton & Harris Chiropractic, Inc.*, 588 U. S. 1, 25 (2019) (KAVANAUGH, J., concurring in judgment).

solution is for Congress to enact a distinct statute of limitations for the APA.

\*    \*    \*

An APA claim does not accrue for purposes of §2401(a)'s 6-year statute of limitations until the plaintiff is injured by final agency action.  Because Corner Post filed suit within six years of its injury, §2401(a) did not bar its challenge to Regulation II.  We reverse the Eighth Circuit's judgment to the contrary and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 22–1008

———————

## CORNER POST, INC., PETITIONER *v.* BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[July 1, 2024]

JUSTICE KAVANAUGH, concurring.

I agree with the Court that a claim under the Administrative Procedure Act accrues when the plaintiff is injured by the challenged agency rule. I also agree with the Court that today's decision vindicates the APA's "'basic presumption' that anyone injured by agency action should have access to judicial review." *Ante*, at 21 (quoting *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140 (1967)).

I write separately to explain a crucial additional point: Corner Post can obtain relief in this case only because the APA authorizes vacatur of agency rules.

Corner Post challenged an agency rule that regulates the fees that banks may charge. But Corner Post is not a bank regulated by the rule. Rather, it is a business that must pay the fees charged by the banks who are regulated by the rule. Corner Post complains that the agency rule allows banks to charge fees that are unreasonably high.

Corner Post's suit is a typical APA suit. An unregulated plaintiff such as Corner Post often will sue under the APA to challenge an allegedly unlawful agency rule that regulates others but also has adverse downstream effects on the plaintiff. In those cases, an injunction barring the agency from enforcing the rule against the plaintiff would not help the plaintiff, because the plaintiff is not regulated

by the rule in the first place.  Instead, the unregulated plaintiff can obtain meaningful relief only if the APA authorizes vacatur of the agency rule, thereby remedying the adverse downstream effects of the rule on the unregulated plaintiff.

The APA empowers federal courts to "hold unlawful and set aside agency action" that, as relevant here, is arbitrary and capricious or is contrary to law.  5 U. S. C. §706(2).  The Federal Government and the federal courts have long understood §706(2) to authorize vacatur of unlawful agency rules, including in suits by unregulated plaintiffs who are adversely affected by an agency's regulation of others.

Recently, the Government has advanced a far-reaching argument that the APA does not allow vacatur.  See Brief for Respondent 42; Brief for United States in *United States* v. *Texas*, O. T. 2022, No. 22–58, pp. 40–44.  Invoking a few law review articles, the Government contends that the APA's authorization to "set aside" agency action does not allow vacatur, but instead permits a court only to enjoin an agency from enforcing a rule against the plaintiff.

If the Government were correct on that point, Corner Post could not obtain any relief in this suit because, to reiterate, Corner Post is not regulated by the rule to begin with.  And the APA would supply no remedy for most other *unregulated* but adversely affected parties who traditionally have brought, and regularly still bring, APA suits challenging agency rules.

The Government's position would revolutionize long-settled administrative law—shutting the door on entire classes of everyday administrative law cases.  The Government's newly minted position is both novel and wrong.  It "disregards a lot of history and a lot of law."  M. Sohoni, The Past and Future of Universal Vacatur, 133 Yale L. J. 2305, 2311 (2024).

The APA authorizes vacatur of agency rules; therefore, Corner Post can obtain relief in this case.

## I

Corner Post owns a truck stop and convenience store in rural North Dakota. When a customer uses a debit card at its business, Corner Post must pay a fee (known as an interchange fee) to the bank that processes the customer's transaction.

As the Court explains, the Dodd-Frank Act requires the Federal Reserve Board to "prescribe regulations" for assessing whether interchange fees are "reasonable and proportional to the cost incurred" in processing a debit-card transaction. 15 U. S. C. §1693*o*–2(a)(3)(A); see *ante*, at 2. Pursuant to the Act, the Board has issued a rule that sets a maximum fee of about 21 cents per transaction. 76 Fed. Reg. 43394, 43420 (2011). For convenience, I will refer to that rule as the fee rule.

Corner Post is not subject to the fee rule. Corner Post does not charge interchange fees to its customers, and Corner Post lacks any authority to set those fees. But because Corner Post must *pay* the fees to banks, it is affected by the agency's rule setting the maximum fees that banks may charge. In particular, Corner Post would be harmed by a fee rule that allows unreasonably high fees and would benefit from a fee rule that more strictly limits the fees that banks may charge.

The APA authorizes any person who has been "adversely affected or aggrieved" by a "final agency action" to obtain judicial review in federal district court. 5 U. S. C. §§702, 704. In an APA suit, the district court "shall" "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." §706(2)(A).

Corner Post filed this APA suit because it believes that the fee rule allows banks to charge unreasonably high fees. In particular, Corner Post argues that the Board's 21-cent fee cap is unreasonably high and therefore arbitrary and capricious under the APA. Corner Post asked the Federal

District Court to vacate the fee rule on the ground that the Board must more strictly regulate bank fees (in other words, that the Board must set a lower cap on the fees that banks may charge).

Corner Post would not be able to obtain relief in its lawsuit through any remedy other than vacatur. Corner Post could not obtain relief through an injunction forbidding the Board from enforcing the rule against it. That is because the rule does not regulate Corner Post and therefore is not and cannot be enforced against Corner Post in the first place. Nor could Corner Post secure relief through an injunction against banks; the APA does not authorize suits against private parties.

Corner Post instead needs a remedy that acts directly on the fee rule—specifically, by vacating it. Indeed, without vacatur, it is hard to imagine what kind of lawsuit Corner Post could file. At oral argument, the Government ultimately seemed to acknowledge that reality and the necessity of the vacatur remedy if Corner Post is to obtain any relief in this case. See Tr. of Oral Arg. 76 ("it's possible that the only way to provide this party relief would be vacatur").[1]

## II

For Corner Post to obtain relief, an important question therefore is whether the APA authorizes vacatur of unlawful agency actions, including agency rules.

The answer is yes—in light of the text and history of the

---

[1] A plaintiff could not challenge the fee rule by suing to "compel agency action" that is "unlawfully withheld or unreasonably delayed." 5 U. S. C. §706(1). The remedy of compelling agency action applies if an agency fails to issue a required rule. But here, the Board issued a rule, and the question is whether the rule set a reasonable fee cap. It would therefore make little sense to say that the fee rule has been "withheld" or "delayed." Indeed, it seems that §706(1) has almost never been used to challenge extant agency rules, as opposed to challenging the absence of required rules.

APA, the longstanding and settled precedent adhering to that text and history, and the radical consequences for administrative law and individual liberty that would ensue if vacatur were suddenly no longer available.

The text and history of the APA authorize vacatur. The text directs courts to "set aside" unlawful agency actions. 5 U. S. C. §706(2)(A). When Congress enacted the APA in 1946, the phrase "set aside" meant "cancel, annul, or revoke." Black's Law Dictionary 1612 (3d ed. 1933); see also Black's Law Dictionary 1537 (4th ed. 1951) (same); Bouvier's Law Dictionary 1103 (W. Baldwin ed. 1926) ("To annul; to make void; as, to set aside an award"). At that time, it was common for an appellate court that reversed the decision of a lower court to direct that the lower court's "judgment" be "set aside," meaning vacated. *E.g.*, *Shawkee Mfg. Co.* v. *Hartford-Empire Co.*, 322 U. S. 271, 274 (1944). Likewise, Congress used the phrase "set aside" in many pre-APA statutes that plainly contemplated the vacatur of agency actions.[2]

The APA incorporated that common and contemporaneous meaning of "set aside." When a federal court sets aside an agency action, the federal court vacates that order—in much the same way that an appellate court vacates the judgment of a trial court.

The APA prescribes the same "set aside" remedy for all categories of "agency action," including agency adjudicative orders and agency rules. §§551(13), 706(2). When a federal court concludes that an agency adjudicative order is

––––––––
[2] See, *e.g.*, Hepburn Act of 1906, ch. 3591, §5, 34 Stat. 584, 592 (courts could "enjoin, set aside, annul, or suspend any order or requirement of" the Interstate Commerce Commission); Securities Exchange Act of 1934, ch. 404, §25(a), 48 Stat. 881, 902 (authorizing courts "to affirm, modify, and enforce or set aside [an] order" of the SEC); Federal Food, Drug, and Cosmetic Act of 1938, ch. 675, §701(f)(3), 52 Stat. 1040, 1055–1056 (authorizing a court to "affirm the order" of the FDA, "or to set it aside in whole or in part, temporarily or permanently").

unlawful, the court must vacate that order. Around the time when Congress enacted the APA, the phrase "set aside" the agency order meant vacate that order. See, *e.g.*, *United States* v. *L. A. Tucker Truck Lines, Inc.*, 344 U. S. 33, 38 (1952). And because federal courts must "set aside" agency rules in the same way that they set aside agency orders, successful challenges to agency rules must award the same remedy. See M. Sohoni, The Power To Vacate a Rule, 88 Geo. Wash. L. Rev. 1121, 1131–1134 (2020). In short, to "set aside" a rule is to vacate it.

Longstanding precedent reinforces the text. Over the decades, this Court has affirmed countless decisions that vacated agency actions, including agency rules. See, *e.g.*, *Department of Homeland Security* v. *Regents of Univ. of Cal.*, 591 U. S. 1, 36, and n. 7 (2020); *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 486 (2001); *Board of Governors, FRS* v. *Dimension Financial Corp.*, 474 U. S. 361, 364–365 (1986). Those decisions vacated the challenged agency rules rather than merely providing injunctive relief that enjoined enforcement of the rules against the specific plaintiffs. See, *e.g.*, *Regents of Univ. of Cal.*, 591 U. S., at 9 (holding that the rescission of a major federal program "must be vacated"). And the D. C. Circuit—which handles the lion's share of the country's administrative law cases—has likewise long recognized vacatur as the usual relief when a court holds that agency rules are unlawful. See, *e.g.*, *National Mining Assn.* v. *United States Army Corps of Engineers*, 145 F. 3d 1399, 1409 (CADC 1998). In the words of the D. C. Circuit: "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon* v. *Thornburgh*, 878 F. 2d 484, 495, n. 21 (CADC 1989).

Importantly, as Corner Post's lawsuit shows, the availability of vacatur determines not only the extent of the

relief that courts may award in APA suits by *regulated* parties, but also whether *unregulated* parties can obtain relief under the APA at all. In most APA litigation brought by unregulated but adversely affected parties, a plaintiff can obtain relief only through vacatur of the adverse agency action. Prohibiting courts from vacating agency actions would essentially close the courthouse doors on those unregulated plaintiffs—a radical change to administrative law that would insulate a broad swath of agency actions from any judicial review.[3]

Vacatur is therefore essential to fulfill the "basic presumption of judicial review" for parties who have been "adversely affected or aggrieved" by federal agency action. *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140 (1967) (quotation marks omitted). The Court has long applied that "strong presumption" unless there is a "persuasive reason to believe" that Congress intended to bar review of certain actions. *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667, 670 (1986) (quotation marks omitted); see also, *e.g.*, *Weyerhaeuser Co.* v. *United States Fish and Wildlife Serv.*, 586 U. S. 9, 22–23 (2018); *Sackett* v. *EPA*, 566 U. S. 120, 128–131 (2012). Eliminating the vacatur remedy would contravene the strong *Abbott Laboratories* presumption by insulating many agency rules from meaningful judicial review (which perhaps is the Government's motivation for its recent campaign).

The absence of vacatur would also create an asymmetry. For example, without the vacatur remedy, a *bank* could still challenge the Board's regulation of interchange fees in a suit for injunctive relief. The bank might argue that the fee cap is too low and that the Board should be enjoined from enforcing the cap against the bank—a result that would

--------

[3] Most of the recent academic and judicial discussion of this issue has addressed suits by regulated parties. That discussion has largely missed a major piece of the issue—suits by unregulated but adversely affected parties.

allow the bank to charge higher fees. But because Corner Post is not subject to the Board's regulation, it could not contend that the fee cap is too high and that the Board should be enjoined from keeping the cap so high. So Corner Post would be precluded from suing even though the allegedly unlawful regulation is causing it monetary injury.[4]

## III

Eliminating vacatur as a remedy would terminate entire classes of administrative litigation that have traditionally been brought by unregulated parties.[5]

One example is the wide range of administrative law suits in which businesses target the allegedly unlawful under-regulation of other businesses, such as their

---

[4] Absent vacatur, the remedy for a *regulated* plaintiff would not automatically extend to other regulated parties. For example, if a district court issued an injunction that prevents the Board from enforcing the fee rule against one bank, the Board would still be able to enforce the fee rule against other banks. For those other banks to obtain the same relief, they would need to either (i) file similar APA suits and request similar injunctions or (ii) wait and see if the fee rule is temporarily enjoined or held unlawful by either the relevant court of appeals or this Court. In that respect, eliminating the vacatur remedy would delay relief for many regulated parties. That said, in light of vertical *stare decisis*, the consequences for regulated parties of eliminating vacatur would not be as severe as the consequences for unregulated parties. See *Labrador* v. *Poe*, 601 U. S. ___, ___ (2024) (KAVANAUGH, J., concurring in grant of stay) (slip op., at 8–9); cf. W. Baude & S. Bray, Proper Parties, Proper Relief, 137 Harv. L. Rev. 153, 183 (2023) (when the Supreme Court "holds a statute to be unconstitutional or a rule to be unlawful, it may be *as good as* vacated").

[5] This opinion focuses primarily on administrative litigation that arises under the APA. But Congress has also enacted special statutory review provisions that similarly authorize federal courts to "set aside" specific agency actions. See, *e.g.*, 15 U. S. C. §78y(a) (orders of the SEC); 16 U. S. C. §825*l*(b) (FERC); 28 U. S. C. §2342 (the FCC, the Atomic Energy Commission, and other agencies). By arguing that the APA's use of "set aside" does not authorize vacatur, the Government implies that vacatur is also unavailable under those similar review provisions.

competitors. For example, in *National Credit Union Administration* v. *First National Bank & Trust Co.*, several banks challenged the decision of a federal agency to approve a series of amendments to the charter of a federal credit union, a competitor of the banks. 522 U. S. 479, 484–485 (1998). The amendments were controversial because they expanded the markets in which the credit union could operate, thereby increasing competition against the banks. The Court held that the banks could sue under the APA to challenge the agency's approval of those charter amendments, and also that the agency's approval of the amendments was unlawful. Of course, the District Court could remedy the banks' harm only by vacating the approval of the amendments. In short, for the plaintiff in *First National Bank* to have a remedy, the APA must have authorized vacatur.

Those competitor suits are ubiquitous in administrative law. Some plaintiffs have challenged the favorable classification of a competitor's drugs or medical products, see, *e.g.*, *American Bioscience, Inc.* v. *Thompson*, 269 F. 3d 1077 (CADC 2001); a research guideline that increased competition for federal grants, see, *e.g.*, *Sherley* v. *Sebelius*, 610 F. 3d 69 (CADC 2010); and a competitor's exemption from a generally applicable rule, see, *e.g.*, *Regular Common Carrier Conference* v. *United States*, 793 F. 2d 376 (CADC 1986) (arose under the review provision in 28 U. S. C. §2342). The Court has consistently held that the plaintiffs incurring those injuries are "adversely affected or aggrieved by agency action" within the meaning of the APA. 5 U. S. C. §702; see *First Nat. Bank*, 522 U. S., at 488, 499; *Investment Company Institute* v. *Camp*, 401 U. S. 617, 618–621 (1971); *Association of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U. S. 150, 157 (1970). But such competitor suits would be largely if not entirely eradicated if the APA and similar statutory review provisions did not authorize vacatur.

Suits where one business challenges the under-regulation of another go well beyond competitor suits. One example is the Court's landmark decision in *Motor Vehicle Manufacturers Association of United States, Inc.* v. *State Farm Mutual Automobile Insurance Co.*, 463 U. S. 29 (1983). That case arose when several insurance companies challenged a federal agency's rescission of safety standards for new motor vehicles. The Court held that the agency's decision to rescind those safety standards was subject to the same degree of judicial review as the decision to issue the standards in the first place. See *id.*, at 40–44. The Court also concluded that the rescission of the safety standards was arbitrary and capricious. See *id.*, at 44–57.

At no point in that landmark opinion on the judicial review of agency actions did the Court state (or need to state) the obvious: Because the agency did not regulate the insurers themselves, the insurers could obtain relief from the downstream effects of the agency's rescission of the safety standards only if the insurers could obtain vacatur of that rescission. The Court did not dwell on that remedial point because the availability of vacatur was presumably obvious to all involved. Only now—some 40 years later—does the Government imply that the premise of *State Farm* was mistaken.

The Government's new position would also largely eliminate the common form of environmental litigation where private citizens sue a federal agency based on the externalities that an agency action is likely to produce. Litigation often arises when a federal agency approves a development project with potential effects on the environment or on other property owners. Examples include the construction of a new pipeline, see *Delaware Riverkeeper Network* v. *FERC*, 753 F. 3d 1304 (CADC 2014), or the mining of federal land, see *WildEarth Guardians* v. *Jewell*, 738 F. 3d 298 (CADC 2013). In those cases, the plaintiff generally cannot bring an APA suit

against the developer, who is usually a private party. See §704 (authorizing review of "agency action"). Instead, the plaintiff typically sues the federal agency that approved the development and asks a federal court to vacate that approval.

Some of those suits proceed under the APA; others proceed under federal statutory review provisions that similarly authorize courts to "set aside" agency action. See, *e.g.*, 15 U. S. C. §717r(b) (Natural Gas Act); 16 U. S. C. §825*l*(b) (Federal Power Act). Regardless, all of those suits depend on the availability of vacatur.

Many APA suits similarly challenge federal emissions limits or efficiency standards for cars, trucks, and other sources of pollution. See, *e.g.*, *American Public Gas Assn.* v. *Department of Energy*, 72 F. 4th 1324 (CADC 2023). When a plaintiff alleges that an emissions limit does too little to stop third parties from polluting the environment, the plaintiff cannot bring an APA suit against the third party. Rather, the plaintiff must sue the agency that enacted the emissions limit. If the vacatur remedy were unavailable, the agency that enacted the emissions limit would never face litigation from unregulated parties seeking stricter limits; the agency could face litigation only from regulated parties seeking looser limits.

Workers and their unions also regularly challenge agency rules that rescind or loosen federal workplace safety standards. See, *e.g.*, *Transportation Div. of Int'l Assn. of Sheet Metal, Air, Rail, and Transp. Workers* v. *Federal Railroad Admin.*, 988 F. 3d 1170 (CA9 2021) (railroad industry); *United Steel* v. *Mine Safety and Health Admin.*, 925 F. 3d 1279 (CADC 2019) (mining industry). Those suits often arise under statutory review provisions that, like the APA, authorize courts to "set aside" agency actions. See, *e.g.*, 28 U. S. C. §2342(7) (railroad industry); 30 U. S. C. §816(a)(1) (mining industry). And the suits all depend on the availability of vacatur as a remedy. In particular, the

workers may prevail in those suits only through vacatur of the agency rules. So if "set aside" did not mean vacate, workplace safety rules could be challenged from only one direction—by employers who want less regulation, not by workers who want more regulation.

The examples of standard agency litigation that depend on the availability of vacatur are seemingly endless. Vacatur was essential when American workers challenged a Department of Labor rule that unlawfully allowed employers to access inexpensive foreign labor, with the effect of lowering American workers' wages. See *Mendoza* v. *Perez*, 754 F. 3d 1002 (CADC 2014). Vacatur was essential when a county challenged the Department of the Interior's allowance for Indian gaming on nearby land. See *Butte Cty.* v. *Hogen*, 613 F. 3d 190 (CADC 2010). Vacatur is often essential when a State challenges an agency action that does not regulate the State directly but has adverse downstream effects on the State. See, *e.g.*, *Department of Commerce* v. *New York*, 588 U. S. 752 (2019).[6]

I will stop there. But to be clear, I could go on all day (and then some) listing cases where vacatur was necessary for an unregulated but adversely affected plaintiff in an

---

[6] In some circumstances, usually when a court rules that an agency must provide additional explanation for the challenged agency action or must regulate some entity or activity *more* extensively, some courts have remanded to the agency without vacatur. Remand without vacatur is essentially a shorthand way of vacating a rule and staying the vacatur pending the agency's completion of an additional required action, such as providing additional explanation or issuing a new, more stringent rule. I do not address that practice here, which has been the subject of some debate. See *Checkosky* v. *SEC*, 23 F. 3d 452, 462–465 (CADC 1994) (Silberman, J.) (explaining the practice); see also *id.*, at 493, n. 37 (Randolph, J.) (noting that courts and parties alternatively may avoid any "difficulties" associated with vacatur by "a stay of the mandate"). Importantly for present purposes, the view that vacatur is "*authorized* by the APA is a basic proposition shared by *both* sides of the debate over remand without vacatur." M. Sohoni, The Power To Vacate a Rule, 88 Geo. Wash. L. Rev. 1121, 1178 (2020).

APA suit to obtain relief.

## IV

Against all of that text, history, precedent, and common sense, the Government has recently rejected the straightforward and long-accepted conclusion that the phrase "set aside" in the APA authorizes vacatur. Instead, the Government contends that plaintiffs harmed by agency rules must seek injunctions against enforcement of those rules. See Brief for United States in *United States* v. *Texas*, O. T. 2022, No. 22–58, pp. 40–44. One effect of the Government's new position would be to insulate many agency rules from meaningful judicial review in suits by unregulated but adversely affected parties.

To support its new position, the Government has offered an array of arguments.

*First*, the Government says that vacatur of a federal rule is akin to a nationwide injunction—in other words, an injunction that prohibits the Government from enforcing a law against *anyone*, not just the parties in a specific case. The Government has contended that equitable relief is ordinarily limited to the parties in a specific case. Therefore, nationwide injunctions would be permissible only if Congress authorized them.

But in the APA, Congress did in fact depart from that baseline and authorize vacatur. As noted above, the text of the APA expressly authorizes federal courts to "set aside" agency action. 5 U. S. C. §706(2). "Unlike judicial review of statutes, in which courts enter judgments and decrees only against litigants, the APA" and related statutory review provisions "go further by empowering the judiciary to act directly against the challenged agency action." J. Mitchell, The Writ-of-Erasure Fallacy, 104 Va. L. Rev. 933, 1012 (2018). The text of §706(2) directs federal courts to vacate agency actions in the same way that appellate courts vacate the judgments of trial courts. See M. Sohoni, The

Power To Vacate a Rule, 88 Geo. Wash. L. Rev. 1121, 1131–1134 (2020). The text of the APA therefore authorizes vacatur of agency rules. By contrast, Congress has rarely authorized courts to act directly on federal statutes or to prohibit their enforcement against nonparties. As a result, background equitable principles may control in those non-APA cases.

*Second*, the Government argues that the remedies available in APA suits are not governed by §706(2), which directs courts to "set aside" agency action, but instead are governed by §703. That argument is weak. Section 703 determines the "form of proceeding" for suits under the APA and identifies the federal actors against whom an "action for judicial review may be brought."[7] But "no court has ever held that Section 703 implicitly delimits the kinds of remedies available in an APA suit." M. Sohoni, The Past and Future of Universal Vacatur, 133 Yale L. J. 2305, 2337 (2024). For good reason: As explained above, the ordinary meaning of "set aside" in §706(2) has long been understood to refer to the remedy of vacatur. The conclusion that §706 governs remedies is also supported by §706(1), which authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed"—unmistakably a remedy. By contrast, the text of §703 "speaks to venue and forms of proceedings, not to remedies, and regardless, its

―――――――――

[7] Section 703 states: "The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement."

listing of the available forms of proceedings is nonexhaustive." Sohoni, The Past and Future of Universal Vacatur, 133 Yale L. J., at 2337.

To support its novel reliance on §703, the Government suggests that the phrase "set aside" in §706(2) may refer to a "rule of decision directing the reviewing court to disregard unlawful" agency actions in "resolving the case before it," rather than the remedy of vacatur. Brief for United States in *United States* v. *Texas*, O. T. 2022, No. 22–58, at 40. But the leading cases and legal dictionaries at the time of the APA's enactment did not use "set aside" in that manner. They instead referred to setting aside (that is, vacating) judgments—a meaning entirely consistent with the APA's authorization to vacate agency actions. See *supra*, at 5. The Government's position instead relies on some colloquial uses of the phrase "set aside" in federal constitutional challenges to state statutes. See, *e.g.*, Brief for United States in *United States* v. *Texas*, O. T. 2022, No. 22–58, at 41 (citing *Mallinckrodt Chemical Works* v. *Missouri ex rel. Jones*, 238 U. S. 41, 54 (1915)); see also *Mallinckrodt*, 238 U. S., at 54 (referring to "one who seeks to set aside a state statute as repugnant to the Federal Constitution"). That is a thin basis for suddenly prohibiting entire categories of long-common administrative litigation.

*Third*, the Government seizes on legislative history to argue that Congress did not expect the APA to create new remedies against unlawful agency actions. But vacatur was not a new remedy. On the contrary, several pre-APA statutes authorized courts to "set aside" specific kinds of agency actions, such as orders by the Interstate Commerce Commission. See n. 2, *supra*. This Court correctly understood those statutes to authorize vacatur. For example, in litigation regarding the regulation of railroads, this Court held that an unlawful ICC order was "void." *United States* v. *Baltimore & Ohio R. Co.*, 293 U. S. 454, 464 (1935). Similar examples abound. See, *e.g.*, Sohoni, The

Past and Future of Universal Vacatur, 133 Yale L. J., at 2329–2335 (collecting cases). By similarly authorizing courts to "set aside" agency actions, the APA likewise authorized vacatur. §706(2).

Moreover, although vacatur was not as common in the years surrounding the APA's enactment, there is a simple explanation for that: Courts had few occasions to set aside agency rules before this Court's 1967 decision in *Abbott Laboratories* v. *Gardner*, which significantly expanded the opportunities for facial, pre-enforcement review of agency rules. 387 U. S. 136, 139–141. Indeed, it was not until *Abbott Laboratories* that "preenforcement review of agency rules" became "the norm, not the exception." S. Breyer & R. Stewart, Administrative Law and Regulatory Policy 1137 (2d ed. 1985).

The Government's current position on vacatur would *de facto* overrule *Abbott Laboratories* as to suits by unregulated parties. Not surprisingly, the Government's current position on vacatur sounds very similar to Justice Fortas' dissent in a companion case to *Abbott Laboratories*, where he lamented that in the wake of those decisions, a court would be able to "suspend the operation of regulations in their entirety." *Gardner* v. *Toilet Goods Assn., Inc.*, 387 U. S. 167, 175 (1967). In any event, to the extent that the Government worries that vacatur of rules (as opposed to orders) is more common today than it was in the 1950s, the Government's true grievance is with *Abbott Laboratories*.

*Fourth*, the Government objects to the real-world consequences that occur when a federal district court wrongly vacates a lawful rule. I appreciate that concern. But federal law already gives the Government tools to mitigate those consequences—if not avoid them altogether. When the Government believes that a district court has erroneously vacated a rule (or erroneously issued a preliminary injunction against a rule), the Government may promptly seek a stay in the relevant federal court of

appeals. To determine whether to grant a stay, the court of appeals may then promptly review the Government's likelihood of success on the merits, among other factors. If the court of appeals denies a stay, the Government may seek further review in this Court. See *Labrador* v. *Poe*, 601 U. S. \_\_\_, \_\_\_ (2024) (KAVANAUGH, J., concurring in grant of stay) (slip op., at 2). The Government's frustration with the occasional incorrect district court vacatur of an agency rule is understandable. But especially given the readily accessible and regularly utilized procedures for staying a district court's vacatur,[8] we should not overreact by entirely gutting vacatur as a remedy and thereby barring unregulated but adversely affected parties from bringing APA suits.

Not surprisingly, when asked at oral argument in this case about the extraordinary consequences of its new no-vacatur position, the Government seemed to backpedal and hedge a bit. The Government suggested that vacatur may actually still be appropriate if it is "the only way to give the party before the court relief." Tr. of Oral Arg. 76. The Government also said that "it's possible that the only way to provide" Corner Post "relief would be vacatur." *Ibid.*

I appreciate the Government's apparent attempt to back away from its extreme stance. But in doing so, the Government also revealed the weakness of its position. The meaning of "set aside" in the APA cannot reasonably depend on the specific party before the court. Either the APA authorizes vacatur, or it does not.

More to the point, the Government's answer at oral argument is a solution in search of a problem. The federal courts have long interpreted the APA to authorize vacatur of agency actions. Both the text and the history of the APA support that interpretation, and courts have had no real

---

[8] If the problem became sufficiently severe, the Executive Branch could always ask Congress to limit the remedies available under the APA.

difficulty applying the remedy in practice. Some 78 years after the APA and 57 years after *Abbott Laboratories*, I would not suddenly throw out that sound and settled interpretation of the APA and eliminate entire classes of historically common and vitally important litigation against federal agencies.

\*    \*    \*

The Government's crusade against vacatur would create "strange and even absurd consequences." Sohoni, The Past and Future of Universal Vacatur, 133 Yale L. J., at 2340. In this opinion, I have described one such consequence: It would leave unregulated plaintiffs like Corner Post without a remedy in APA challenges to agency rules. The Government's position therefore would fundamentally reshape administrative law, leaving administrative agencies with extraordinary new power to issue rules free from potential suits by unregulated but adversely affected parties—businesses, environmental plaintiffs, workers, the list goes on.

I agree with the longstanding consensus—a consensus based on text, history, precedent, and common sense—that vacatur is an appropriate remedy when a federal court holds that an agency rule is unlawful. Because vacatur remains an available remedy under the APA, Corner Post can obtain meaningful relief if it prevails in this lawsuit.

# SUPREME COURT OF THE UNITED STATES

———

No. 22–1008

———

## CORNER POST, INC., PETITIONER *v.* BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[July 1, 2024]

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting.

More than half a century ago, this Court highlighted the long-recognized "hazards inherent in attempting to define for all purposes when a 'cause of action' first 'accrues.'" *Crown Coat Front Co.* v. *United States*, 386 U. S. 503, 517 (1967). Today, the majority throws that caution to the wind and engages in the same kind of misguided reasoning about statutory limitations periods that we have previously admonished.

The flawed reasoning and far-reaching results of the Court's ruling in this case are staggering. First, the reasoning. The text and context of the relevant statutory provisions plainly reveal that, for facial challenges to agency regulations, the 6-year limitations period in 28 U. S. C. §2401(a) starts running when the rule is published. The Court says otherwise today, holding that the broad statutory term "accrues" requires us to conclude that the limitations period for Administrative Procedure Act (APA) claims runs from the time of a plaintiff's injury. Never mind that this Court's precedents tell us that the meaning of "accrues" is context specific. Never mind that, in the administrative-law context, limitations statutes uniformly run from the

moment of agency action. Never mind that a plaintiff's injury is utterly irrelevant to a facial APA claim. According to the Court, we must ignore all of this because, for other kinds of claims, accrual begins at the time of a plaintiff's injury.

Next, the results. The Court's baseless conclusion means that there is effectively no longer any limitations period for lawsuits that challenge agency regulations on their face. Allowing every new commercial entity to bring fresh facial challenges to long-existing regulations is profoundly destabilizing for both Government and businesses. It also allows well-heeled litigants to game the system by creating new entities or finding new plaintiffs whenever they blow past the statutory deadline.

The majority refuses to accept the straightforward, commonsense, and singularly plausible reading of the limitations statute that Congress wrote. In doing so, the Court wreaks havoc on Government agencies, businesses, and society at large. I respectfully dissent.

## I

When a claim accrues depends on the nature of the claim. See *Crown Coat*, 386 U. S., at 517. So, understanding the context in which *these* claims arose is essential to determining when Congress meant for them to accrue. The facts of this very case illustrate the absurdity of the majority's one-size-fits-all approach. The procedural history is also a prime example of the gamesmanship that statutory limitations periods are enacted to prevent.

## A

Start with the relevant agency regulation. In 2010, Congress required the Federal Reserve Board to issue rules for debit-card transaction fees. See 15 U. S. C. §1693*o*–2(a)(1). The Board did as Congress instructed. As relevant here, in

2011, the Board issued Regulation II, capping debit-card interchange fees at 21 cents per transaction plus 0.05 percent of the transaction. 76 Fed. Reg. 43420 (2011) (codified at 12 CFR §253.3(b) (2022)).

As often happens, affected parties challenged Regulation II almost immediately after the Board issued it Several large trade groups sued under the APA, alleging that Regulation II was, in several respects, arbitrary, capricious, and not in accordance with law. *NACS* v. *Board of Governors of FRS*, 958 F. Supp. 2d 85, 95–96 (DC 2013). Ultimately, the D. C. Circuit rejected that challenge in relevant part. *NACS* v. *Board of Governors of FRS*, 746 F. 3d 474, 477 (2014). And, a few months after that, we denied certiorari. See 574 U. S. 1121 (2015).

## B

Now consider the facts of this challenge. In the majority's telling, this is about a single "truckstop and convenience store located in Watford City, North Dakota." *Ante,* at 1.

Not quite. Rather, two large trade groups initially filed this action in 2021—a full decade after the Federal Reserve Board finalized the debit-card-fee regulations at issue. Those groups were the North Dakota Petroleum Marketers Association, a "trade association that has existed since the mid-1950s," and the North Dakota Retail Association, another trade group. App. to Pet. for Cert. 53. Corner Post, which had only opened its doors in 2018, was not a party to the trade groups' initial complaint. The Government moved to dismiss the pleading, invoking §2401(a)'s 6-year statute of limitations. In response, the trade groups sought leave to amend.

It was only then that Corner Post was added as a plaintiff. And, importantly, other than the addition of Corner Post, the trade groups' complaint remained practically identical to the untimely one they had filed before. Other than a few changes of phrasing and some newly available

2019 data, the amended complaint alleged the same facts and sought the same relief as the original pleading. It also included the exact same legal claims—verbatim. The only material change to the amended complaint was the addition of Corner Post.

Thus, even before I analyze the statute of limitations arguments, one can see that this case is the poster child for the type of manipulation that the majority now invites— new groups being brought in (or created) just to do an end run around the statute of limitations.[1] To repeat: The claims in Corner Post's lawsuit were not new or in any way distinct (even in wording) from the pre-existing and untimely claims of the trade organizations that had been around for decades.

This time, however, when the Government renewed its motion to dismiss, the plaintiffs made the case all about Corner Post. The plaintiffs argued that, because Corner Post had not yet formed as a company when the Board issued Regulation II, it simply could not be subjected to a 6-year limitations period that ran from when the challenged regulation issued back in 2011. (One wonders how a company that formed against the backdrop of a long-settled rule could possibly be entitled to complain, or claim injury, related to the regulatory environment in which it willingly entered—but I digress.) Rather than accepting that the untimely challenge remained so, Corner Post demanded a personalized, plaintiff-specific limitations rule, giving an entity six years from when *it* was first affected by a

———————

[1] If this case illustrates one type of gamesmanship, one does not need to think hard to imagine other examples. A cash-only business that announces its intent to accept debit cards and thereby claiming injury from the debit-card rule. New owners that buy out a shop, insisting that they too are entitled to challenge the debit-card rule based on their status as new entrants into the marketplace. It is telling that, even as the majority says that the moment of the plaintiff's injury marks the start of the limitations period for facial APA challenges, the majority fails to describe precisely when that injury occurs in this context.

Government action to file a facial challenge.

The District Court rejected Corner Post's argument, following the lead of every court of appeals that had ever addressed accrual of an APA facial challenge.[2]  It held that the addition of Corner Post as a plaintiff did not make a difference to the timeliness of the business groups' claims.  The Eighth Circuit affirmed, holding that "when plaintiffs bring a facial challenge to a final agency action, the right of action accrues, and the limitations period begins to run, upon publication of the regulation."  *North Dakota Retail Assn.* v. *Board of Governors of FRS*, 55 F. 4th 634, 641 (2022).

## II

But here we are.  Three-quarters of a century after Congress enacted the APA, a majority of this Court rejects the consensus view that, for facial challenges to agency rules, the statutory 6-year limitations period runs from the publication of the rule.  Instead, it holds that an APA claim accrues "when the plaintiff is injured by final agency action."  *Ante,* at 1.  The majority maintains that the text of §2401(a) demands this result.  But if that answer is so obvious, one wonders why no court proclaimed it until more than 75 years after all the statutory pieces were in place.

To explain how the majority got this ruling wrong, I find it necessary to provide the right answer.  Here, the relevant

_____

[2] The majority's opinion says we took this case to resolve a circuit split, suggesting that the Sixth Circuit had reached the contrary conclusion. See *ante,* at 3–4.  It had not.  In *Herr* v. *United States Forest Serv.*, 803 F. 3d 809 (2015), the Sixth Circuit addressed accrual in the context of an *as-applied* challenge after the Government had threatened enforcement. There, the Circuit pegged accrual to the moment of the injury allegedly caused by application of the rule to the plaintiff, see *id.*, at 820, and did not discuss whether that same accrual rule would apply to facial challenges.  Since *Herr*, neither the Sixth Circuit nor any district court within it has extended *Herr*'s rule to facial challenges to final agency actions, and at least one District Court has expressly rejected such an extension. See *Linney's Pizza, LLC* v. *Board of Governors of FRS*, 2023 WL 6050569, *2–*4 (ED Ky., Sept. 15, 2023).

statutory text is the catchall limitations provision for suits brought against the United States: §2401(a) of Title 28 of the United States Code. All agree that there are two key terms in that provision—"accrues" and "the right of action." *Ibid.* The majority misreads both. Contrary to the Court's rigid reading, the word "accrues" lacks any fixed meaning. See *Crown Coat*, 386 U. S., at 517. Instead, the meaning of accrue for the purpose of a statute of limitations is determined by the particular "right of action" at issue. For many kinds of legal claims, accrual is plaintiff specific because the claims themselves are plaintiff specific. But facial administrative-law claims are not. This means that, in the administrative-law context, the limitations period begins not when a plaintiff is injured, but when a rule is finalized.

A

When sovereign immunity has been waived, the Federal Government is often sued, and Congress has enacted statutes of limitations to ensure that those lawsuits are brought in a timely fashion. Because such suits arise in different contexts, Congress has enacted different statutes of limitations for different types of suits.

Most statutes of limitations are context specific. For example, a tort claim against the United States typically must be brought "within two years after such claim accrues." 28 U. S. C. §2401(b). By contrast, a party challenging certain administrative orders must seek review "within 60 days after [the order's] entry." §2344. Many more examples of context-specific limitations periods in the U. S. Code abound. See, *e.g.*, §2501 (claims over which the United States Court of Federal Claims has jurisdiction must be brought within six years); 33 U. S. C. §1369(b)(1) (challenges to certain standards adopted by the Environmental Protection Agency under the Clean Water Act must commence "within 120 days from the date of . . . promulgation").

The statute at issue here—28 U. S. C. §2401(a)—supplements those specific provisions. In doing so, §2401(a) serves a special purpose: to act as a catchall that imposes an outer time limit on claims brought against the United States when no other statute of limitations applies. Under §2401(a), "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." This catchall limitations statute has been applied in a range of contexts, including APA claims (like this one), contract claims, see *Crown Coat*, 386 U. S., at 510–511, and more, see, *e.g.*, *Natural Resources Defense Council* v. *Haaland*, 102 F. 4th 1045, 1074 (CA9 2024) (claims under the Endangered Species Act).

Consistent with the broad scope of its potential application, §2401(a) uses broad language. It starts the 6-year clock when "the right of action first accrues." §2401(a). No more elaboration or specificity is given. So, what *does* the sparse text of §2401(a) tell us?

To start, the statute tells us to look at when "the right of action *first* accrues." (Emphasis added.) The word "first" directs us to start the clock at the earliest possible opportunity once the claim accrues. From the text alone, then, we know that this moment in time should happen sooner rather than later. But *when* that moment occurs depends on the meaning of both "the right of action" and "accrues."

Next, the provision uses the unadorned phrase "the right of action." Because this statute is applicable to a broad range of causes of action against the Government, the underlying statute (here the APA) provides "the right of action," not §2401(a) itself. Put another way, the §2401(a) catchall applies to different causes of action, and those causes of action establish different legal claims. Though the right of action is not the same for an APA claim as it is for an Endangered Species Act claim, §2401(a)'s broad "right of action" language applies to both of these claims, and more.

## B

A proper understanding of the word "accrues" makes clear that this term is far more flexible and context dependent than the majority appreciates. Crucially, the Court has said this very thing before—more than once, in fact. We have long understood that it is simply not "possible to assign the word 'accrued' any definite technical meaning which by itself would enable us to say whether the statutory period begins to run at one time or the other." *Reading Co.* v. *Koons*, 271 U. S. 58, 61–62 (1926); see also *Crown Coat*, 386 U. S., at 517 (recognizing "the hazards inherent in attempting to define for all purposes when a 'cause of action' first 'accrues'").

But, for some reason, that does not stop the majority from trying here. Its opinion repeatedly asserts that the ordinary meaning of accrual is that claims accrue only when a plaintiff can sue. See *ante,* at 6–10.[3] But even the majority acknowledges that its preferred definition of accrual is not universal; it is, at most, "the '*standard* rule'" that "can be displaced." *Ante,* at 8 (quoting *Green* v. *Brennan*, 578 U. S. 547, 554 (2016); emphasis added).

Far from imposing a one-size-fits-all definition of the word "accrue," this Court has traditionally taken a claim-specific view: "[A] right accrues when it comes into existence." *United States* v. *Lindsay*, 346 U. S. 568, 569 (1954). For example, in *McMahon* v. *United States*, 342 U. S. 25 (1951), we held that, under the Suits in Admiralty Act, a claim accrued when a seaman was injured, even though he could not yet sue at that time. See *id*., at 27–28. In *Crown*

--------

[3] The majority insists on a single definition of "accrued," but it cannot keep its story straight as to what that definition is. Its opinion offers multiple formulations, stating that a claim accrues "when it comes into existence," "when the plaintiff has a complete and present cause of action," "when a suit may be maintained thereon," and, also, "after the plaintiff suffers the injury." *Ante,* at 7–8 (internal quotation marks omitted). These distinctions can make a difference.

*Coat*, we held the opposite—a claim brought under 28 U. S. C. §1346 did not accrue at the time of injury, but rather at the moment of final administrative action, because a plaintiff could not sue until the agency action was final. See 386 U. S., at 513–514, 517–518. The point is *not* that these cases all point in one direction or the other with respect to the meaning of accrue. Instead, our cases illustrate what this Court has expressly stated: The term "accrued" lacks "any definite technical meaning," *Reading*, 271 U. S., at 61.

The majority nevertheless decrees today that accrual must always be plaintiff specific—*i.e.,* that a claim cannot accrue until "this particular plaintiff" can bring suit. *Ante,* at 14. But that is not what §2401(a) says. It does not say that the clock starts when *the plaintiff's* right of action first accrues; rather, §2401(a) starts the clock when "*the* right of action first accrues." (Emphasis added.) In other words, the limitations provision here focuses on the claim being brought without regard for who brings it.

The dictionary definitions on which the majority relies further highlight this important observation. A claim accrues, according to those definitions, "'when *a* suit may be maintained thereon'" or upon the "'coming or springing into existence of *a* right to sue.'" *Ante,* at 7 (emphasis added) (first quoting Black's Law Dictionary 37 (4th ed. 1951), then quoting Ballentine's Law Dictionary 15–16 (2d ed. 1948)). Again, and notably, these dictionaries speak of *a* right to sue, not *the plaintiff's* right to sue. Like §2401(a) itself, these definitions do not support the majority's assertion that accrual is necessarily plaintiff specific.

Of course, many of our cases *do* say that a claim accrues when "'the plaintiff has a complete and present cause of action.'" *E.g.*, *Gabelli* v. *SEC*, 568 U. S. 442, 448 (2013); *Wallace* v. *Kato*, 549 U. S. 384, 388 (2007); *Graham County Soil & Water Conservation Dist.* v. *United States ex rel. Wilson*, 545 U. S. 409, 418 (2005); *Bay Area Laundry and Dry*

*Cleaning Pension Trust Fund* v. *Ferbar Corp. of Cal.*, 522 U. S. 192, 201 (1997). But those statements were made in the context of particular cases, each of which dealt with plaintiff-specific causes of action. See, *e.g.*, *Gabelli*, 568 U. S., at 446 (civil enforcement claim by the Securities and Exchange Commission); *Wallace*, 549 U. S., at 388 (false imprisonment and arrest claims); *Graham County*, 545 U. S., at 412 (retaliation claim against an employer); *Bay Area Laundry*, 522 U. S., at 195 (claim alleging failure to make required payments to employee pension funds).

Here is what I mean by this. When a complaint brought against a defendant asserts, "You falsely imprisoned me," or "You retaliated against me," it is making a legal claim that is specific to the particular plaintiff. But, as discussed below, it is not similarly plaintiff specific to bring a claim saying, for example, that a particular regulation is invalid because it "exceeds the Board's statutory authority," or because the Government "failed to consider important aspects of the problem," as the complaint here alleges. App. to Pet. for Cert. 80, 82. So, while accrual may sometimes—even usually—be plaintiff specific, that is just because underlying legal claims are often plaintiff specific. The precedents the majority cites never say otherwise; *i.e.*, they do not tell us that accrual must *always* be plaintiff specific.

The majority's other hard-and-fast distinction—between statutes of limitations and statutes of repose—fares no better. See *ante,* at 9–10. The majority sets up a dichotomy: Statutes of limitations are plaintiff-centric rules that "'require plaintiffs to pursue diligent prosecution of known claims,'" while statutes of repose emphasize finality and are tied to "'the last culpable act or omission of the defendant.'" *Ante,* at 9 (quoting *CTS Corp.* v. *Waldburger*, 573 U. S. 1, 8 (2014)). The problem is that statutes of limitations and statutes of repose, while different, are not nearly as different as the majority imagines. It is true that statutes of repose are considered to be "defendant-protective."

*Ante,* at 10. But the same is true of statutes of limitations. "The very purpose of a period of limitation is that there may be, at some definitely ascertainable period, an end to litigation." *Reading*, 271 U. S., at 65; see also *Gabelli*, 568 U. S., at 448 (repose is a "'basic polic[y] of all limitations provisions'"). In fact, according to one of the dictionaries the majority cites, "[s]tatutes of limitation *are* statutes of repose." Black's Law Dictionary, at 1077 (emphasis added). The difference is that unlike statutes of repose, statutes of limitations have more than one purpose: they bring finality for defendants *and* prevent plaintiffs from sleeping on their rights. Understanding these dual functions sheds no light whatsoever on what to do when those competing purposes point in different directions.[4]

## III

Because different claims accrue at different times, we must look to the specific types of claims that the plaintiffs have brought and consider the context in which the limitations period operates. "Cases under [one statute] do not necessarily rule . . . claims" brought under another. *Crown Coat*, 386 U. S., at 517. And our understanding of accrual for limitations purposes has always been context specific. See, *e.g.*, *Wallace*, 549 U. S., at 389 (relying on torts treatises to explain the "distinctive rule" for commencement of limitations period for false imprisonment suits); *Franconia Associates* v. *United States*, 536 U. S. 129, 142–144 (2002) (citing contracts treatises to explain that contract claims accrue at the moment of breach); *Merck & Co.* v. *Reynolds*,

---

[4] Here, these purposes are at odds because repose favors starting the clock at the moment of final agency action, whereas a plaintiff-specific limitations rule would be targeted at a plaintiff's injury to ensure plaintiffs don't sleep on their rights. In the administrative-law context, one has to choose between those objectives; no one rule can equally achieve both of these ends.

559 U. S. 633, 644–646 (2010) (applying fraud-specific dis-
covery rule to determine accrual). In other words, to under-
stand when "the right of action" accrues under §2401(a), we
must understand what the right of action is.

## A

The right of action that is invoked in many administra-
tive-law cases, including this one, is a statutory claim that
an agency has violated certain legal requirements when it
took a certain action, such that the agency's action itself is
invalid. See, *e.g.,* 5 U. S. C. §706(2). And Congress has re-
peatedly made clear, through various statutory enact-
ments, that in the administrative-law context, the statute
of limitations for filing a claim that seeks to invalidate the
agency action runs from the moment of final agency action.

Take the Administrative Orders Review Act (also known
as the Hobbs Act), for example. See 28 U. S. C. §2342. That
statute is the exclusive mechanism for reviewing certain or-
ders issued by over a half-dozen federal agencies. The Act
requires suits to be brought "within 60 days after [the] en-
try" of any final agency order. §2344. There are many other
similar statutes. In its brief, the Government provided us
with more than two dozen statutory provisions where the
limitations period starts running at the moment of final
agency action—whether that action is the publication of a
rule, or the issuance of an order, or something else. See
Brief for Respondent 15–17, and n. 4. And, as the Govern-
ment itself acknowledges, even that list is not comprehen-
sive. See Tr. of Oral Arg. 51 ("Candidly, we got to a page-
long footnote and stopped").[5]

———————

[5] No kidding. On top of the dozens of examples that the Government
provided, there are many, many others. See, *e.g.*, 5 U. S. C.
§7703(b)(1)(A) ("[A] petition to review a final order or final decision of the
[Merit Systems Protection] Board shall be filed . . . within 60 days after
the Board issues notice of the final order or decision of the Board"); 15
U. S. C. §80b–13(a) ("Any person or party aggrieved by an order issued
by the [Securities and Exchange] Commission under this subchapter

Despite the dozens of statutes that start the limitations period at the moment of final agency action, neither Corner Post nor the majority identifies a single statute in the administrative-law context—either now or before 1948—that takes any other approach. This tells us exactly the message that Congress might have expected courts to infer when interpreting §2401(a): For administrative-law actions, a claim accrues at the moment of final agency action.

The Court says we must ignore these other statutes because they post-date Congress's 1948 enactment of §2401(a). See *ante,* at 12–14. The majority's reasoning is doubly wrong. First, it is wrong on the facts. Even before 1948, Congress consistently started limitations periods in the administrative-law context at the moment of the last

———————

may obtain a review of such order . . . by filing . . . within sixty days after the entry of such order, a written petition"); 30 U. S. C. §1276(a)(2) ("Any [covered] order or decision . . . shall be subject to judicial review on or before 30 days from the date of such order or decision"); 38 U. S. C. §7266(a) ("[T]o obtain review . . . of a final decision of the Board of Veterans' Appeals, a person adversely affected by such decision shall file a notice of appeal with the Court within 120 days after the date on which notice of the decision is issued"); 42 U. S. C. §405(g) ("Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision"); §1395*oo*(f )(1) ("Providers shall have the right to obtain judicial review of any final decision of the [Provider Reimbursement Review] Board . . . by a civil action commenced within 60 days of the date on which notice of any final decision by the Board . . . is received"); §7607(b)(1) ("Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise"); 49 U. S. C. §1153(b)(1) (petitions seeking review of National Transportation Safety Board orders that relate to aviation matters "must be filed not later than 60 days after the order is issued").

agency action.[6]   Then, as now, Congress decided that the
deadline for reviewing agency actions should be pegged to
the action under review.  Second, the majority misses the
broader point: Whenever Congress imposes a deadline to
challenge an agency decision, the limitations period always
starts at the moment of the last agency action.  We should
pay attention to the uniformly expressed judgment of Con-
gress, and read §2401(a) accordingly.

Somehow, the majority draws the opposite conclusion.  In
its view, either Congress's consistently expressed intention
is irrelevant to what §2401(a) means, or Congress's failure
to explicitly express that intention in the text of §2401(a)
indicates that Congress decided otherwise in this particular
statute (after all, Congress could have expressly pegged ac-
crual to final agency action in §2401(a) but did not do so).
See *ante,* at 8–10. [7]   But mechanically drawing these sorts

——————

[6] See, *e.g.*, 42 Stat. 162 (1921) (codified at 7 U. S. C. §194(a)) (meat-
packers must appeal agency orders within 30 days after service of order);
48 Stat. 1093 (1934) (codified as amended at 47 U. S. C. §402(c)) (Federal
Communications Commission orders must be challenged in court "within
twenty days after the decision complained of is effective"); 49 Stat. 860
(1935) (codified at 16 U. S. C. §825*l*(b)) (orders issued by the Federal
Power Commission pursuant to the Public Utility Act of 1935 must be
challenged in court "within sixty days after the order of the Commis-
sion"); 49 Stat. 980 (1935) (codified at 27 U. S. C. §204(h)) (orders related
to alcohol permits must be challenged "within sixty days after the entry
of such order"); 52 Stat. 112 (1938) (codified at 15 U. S. C. §45) (Federal
Trade Commission cease-and-desist orders must be challenged "within
sixty days from the date of the service of such order"); 52 Stat. 831 (1938)
(codified at 15 U. S. C. §717r(b)) (orders issued by the Federal Power
Commission pursuant to the Natural Gas Act must be challenged in
court "within sixty days after the order of the Commission"); 52 Stat.
1053 (1938) (codified at 21 U. S. C. §355(h)) (orders related to new drug
applications must be challenged in court "within sixty days after the en-
try of such order"); 54 Stat. 501 (1940) (orders apportioning costs for cer-
tain bridge projects must be challenged in court "within three months
after the date such order is issued").

[7] The majority criticizes my review of congressional action in this area,
but fails to adequately explore the record itself.  *Ante,* at 12–14.  The

of negative inferences when interpreting statutes can be risky. "Context counts, and it is sometimes difficult to read much into the absence of a word that is present elsewhere in a statute." *Bartenwerfer* v. *Buckley*, 598 U. S. 69, 78 (2023).

The majority's approach overlooks relevant context in all sorts of ways, including the fact that §2401(a) is a catchall provision that applies to a variety of actions—that is, the language we are interpreting here does not apply *only* in the administrative-law context. It applies to *every* suit against the United States not covered by another statute of limitations. One cannot expect for Congress to have explicitly stated that accrual in §2401(a) starts at the point of final agency action when §2401(a) is a residual provision that also applies to claims that do not involve agency action at all.[8]

Frankly, it was also entirely unnecessary for Congress to be explicit regarding its intentions. Again, in the administrative-law context, the consistent rule is *not* the plaintiff-specific accrual rule that exists in other contexts (*e.g.,* torts), but the rule that applies every time Congress has ever mentioned a limitations period with respect to a suit against an agency: The claim accrues at the moment of final agency action. So it is no wonder that Congress did not expressly mention this in the text of §2401(a)—it did not have to, for those who have a basic understanding of its statutes.

What is more, the standard accrual rule for the administrative-law context makes perfect sense. The APA itself focuses on the agency's action, not on the plaintiff. Section 704 subjects certain "agency action[s]" to judicial review.

—————

majority's conclusion that the accrual rule is plaintiff specific for APA claims is no more than *ipse dixit*.

[8] Contra the majority, see *ante,* at 12, the fact that Congress *could* have opted to enact a specific statutory review provision for APA claims says nothing about how we should apply the catchall review provision here.

Section 706 lays out the scope of judicial review. As relevant here, courts shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U. S. C. §706(2)(A). Other subsections of §706 likewise focus exclusively on what the *agency* did. Did the *agency* act "in excess of statutory jurisdiction"? §706(2)(C). Did the *agency* act "without observance of procedure required by law"? §706(2)(D).

Section 702 is not to the contrary. The majority suggests otherwise, characterizing §702 as "equip[ping] injured parties with a cause of action." *Ante,* at 5. This is a misleading characterization. Section 702 restricts *who* may challenge agency action: only those "person[s] suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." It is simply a limitation on who can sue. As such, it says nothing about the cause of action that such a person might bring, nor does it establish that an injury is an element of the claim, as the majority mistakenly suggests.[9] And that is for good reason, since, in administrative

—————————

[9] The majority puts too much stock in the fact that §702 references an injury: That reference actually does no more than highlight the distinction between what constitutes a claim and who can bring that claim. See *ante,* at 4–5, and n. 1. This type of distinction is commonplace in many areas of our jurisprudence. Take, for example, the constitutional standing doctrine, which limits eligible plaintiffs to those who have suffered an injury in fact that is both traceable to the defendant's conduct and redressable in court. See *FDA* v. *Alliance for Hippocratic Medicine*, 602 U. S. 367, 380–385 (2024). Whether a particular plaintiff has standing to sue says nothing about the elements of the claim itself. See *Haaland* v. *Brackeen*, 599 U. S. 255, 291 (2023) ("We do not reach the merits of these claims because no party before the Court has standing to raise them"). The distinction between what a claim is and who can bring it applies with full force here. Section 702 codifies an injury requirement for bringing APA claims. Whether a particular plaintiff was "adversely affected or aggrieved by agency action within the meaning of a relevant statute" under §702 is a threshold inquiry about whether she is an appropriate plaintiff; it has no bearing on whether the agency did, in fact,

actions, the claim itself remains focused on the agency. See *Crown Coat*, 386 U. S., at 513 ("The focus of the court action is the validity of the administrative decision").

The way that courts review agency actions also reinforces this basic observation. Courts do not look at what happened to the plaintiff or what happened after the rulemaking—they look only at the rule and the rulemaking process itself. See *SEC* v. *Chenery Corp.*, 318 U. S. 80, 95 (1943). "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp* v. *Pitts*, 411 U. S. 138, 142 (1973) (*per curiam*). Anything that happened after the rule's publication (including, perhaps, some injury to a regulated party) does not matter to an APA claim. So, the available claims, causes of action, and evidence are the same regardless of who brings the challenge or when they bring it.

Again, the complaint in this case proves the point. Before Corner Post was added as a plaintiff, the complaint alleged that (1) Regulation II is contrary to law and exceeds the Board's statutory authority, and (2) Regulation II is arbitrary and capricious. See Complaint in *North Dakota Retail Assn.* v. *Board of Governors of FRS*, No. 1:21–cv–00095 (D ND), ECF Doc. 1, pp. 32–36. After Corner Post was added as a plaintiff, the complaint made exactly those same two legal claims. See App. to Pet. for Cert. 79–84. Before Corner Post was added, the contrary-to-law claim said that the Board considered impermissible costs and capped interchange fees in a way that was not proportional to the specific costs of each transaction. See ECF Doc. 1, at 32–34. After Corner Post was added, the contrary-to-law claim said the exact same thing. See App. to Pet. for Cert. 79–81. Be-

––––––––

act in a manner that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," §706(2).

fore the addition of Corner Post, the arbitrary-and-capricious claim said that the Board failed to consider certain congressional instructions, relied on factors that Congress did not intend for it to consider, and ran counter to evidence before the Board. See ECF Doc. 1, at 34–36. Those claims, too, were unchanged after the addition of Corner Post. See App. to Pet. for Cert. 82–84.

From the pleadings filed in this case, three observations stand out. First, these APA claims, like all APA claims, are about what the agency itself did, so the logical point to start the clock is the moment the agency acted. Second, the claims that Corner Post brings are not specific to it—they are identical to the untimely claims the coplaintiff trade groups brought before. And, finally, although the majority puts procedural challenges to the side—asserting that its holding does not extend to those, see *ante,* at 21, n. 8—the claims in this case *are* procedural, so the majority's line-drawing exercise is meaningless.

## B

On the matter of congressional intent, the consistent accrual rule in the administrative-law context (the limitations period starts running at the time of the final agency action) is patently superior to the majority's reading of §2401(a). Congress enacts statutes of limitations to achieve basic policy goals: "repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Rotella* v. *Wood*, 528 U. S. 549, 555 (2000); see also *Gabelli*, 568 U. S., at 448. For APA claims, where rulemakings apply to the public writ large, repose and certainty would *never* exist if any and every newly formed entity can challenge every agency regulation in existence. Stated simply, the majority has adopted an implausible reading of §2401(a), because, as I explain below, a plaintiff-specific accrual rule operating in this context undermines each of the central goals of all limitations

provisions.

First, repose. This principle means that, at some point, litigation must end. Under the majority's reading of the statute, it never will. Instead of putting a stop to things after six years, §2401(a) now does nothing to prevent agency rules from being forever subjected to legal challenge by newly formed entities (or, as this case illustrates, by old entities that can find or create new entities to graft onto their complaint).[10]

Second, elimination of stale claims. The majority forces courts and agencies to parse cold administrative records. Long after the action in question, courts may be ill equipped to review decades-old administrative explanations.

Last, certainty. As I explain in Part IV, *infra*, the majority's approach creates uncertainty for the Government and every entity that relies on the Government to function. Agency rulemaking serves important "notice and predictability purposes." *Talk America, Inc.* v. *Michigan Bell Telephone Co.*, 564 U. S. 50, 69 (2011) (Scalia, J., concurring). When an administrative agency changes its own rules, it follows specific, established processes, so parties have some predictability about how the rules of the road might change. But when every rule on the books can perpetually be challenged by any new plaintiff, and is thus subject to limitless ad hoc amendment, no policy determination can ever be put to rest, and certainty about the rules that govern will forever remain elusive.

---

[10] The fact that "courts entertaining later challenges often will be able to rely on binding Supreme Court or circuit precedent," *ante,* at 21, is irrelevant. What we are deciding now is how the statute of limitations should be interpreted, and more specifically, whether it makes sense to interpret it in a way that is inconsistent with the purpose of such statutes.

IV

Today's ruling is not only baseless. It is also extraordinarily consequential. In one fell swoop, the Court has effectively eliminated any limitations period for APA lawsuits, despite Congress's unmistakable policy determination to cut off such suits within six years of the final agency action. The Court has decided that the clock starts for limitations purposes whenever a new regulated entity is created. This means that, from this day forward, administrative agencies can be sued in perpetuity over every final decision they make.

The majority's ruling makes legal challenges to decades-old agency decisions fair game, even though courts of appeals had previously applied §2401(a) to find untimely a range of belated APA challenges. For example, a lower court rejected an APA challenge to the Food and Drug Administration's approval of the abortion medication mifepristone that was brought more than two decades after the relevant agency action. See *Alliance for Hippocratic Medicine* v. *FDA*, 78 F. 4th 210, 242 (CA5 2023). A 2008 APA challenge to a 1969 ruling by the Bureau of Alcohol, Tobacco, Firearms and Explosives implementing the Gun Control Act was also bounced on statute of limitations grounds. See *Hire Order Ltd.* v. *Marianos*, 698 F. 3d 168, 170 (CA4 2012). Other unquestionably tardy APA suits have been dismissed on similar grounds too.[11]

No more. After today, even the most well-settled agency

---

[11] See, *e.g.*, *Alabama* v. *PCI Gaming Auth.*, 801 F. 3d 1278, 1292 (CA11 2015) (2013 challenge to Secretary of Interior's 1984, 1992, and 1995 decisions to take certain land into trust for tribes); *Wong* v. *Doar*, 571 F. 3d 247, 263 (CA2 2009) (2007 challenge to 1980 Medicaid regulation); *Dunn-McCampbell Royalty Interest, Inc.* v. *National Park Serv.*, 112 F. 3d 1283, 1286–1287 (CA5 1997) (1994 challenge to 1979 National Park Service regulations); *Shiny Rock Mining Corp.* v. *United States*, 906 F. 2d 1362, 1365–1366 (CA9 1990) (1984 challenges to 1964 and 1965 land management orders).

regulations can be placed on the chopping block. And please take note: The fallout will not stop with new challenges to old rules involving the most contentious issues of today. *Any* established government regulation about *any* issue—say, workplace safety, toxic waste, or consumer protection—can now be attacked by *any* new regulated entity within six years of the entity's formation. A brand new entity could pop up and challenge a regulation that is *decades* old; perhaps even one that is as old as the APA itself. No matter how entrenched, heavily relied upon, or central to the functioning of our society a rule is, the majority has announced open season.

Still, in issuing its ruling in this case, the Court seems oddly oblivious to the most foreseeable consequence of the accrual rule it is adopting: Giving every new entity in a regulated industry its own personal statute of limitations to challenge longstanding regulations affects our Nation's economy. Why? Because administrative agencies establish the baseline rules around which businesses and individuals order their lives. When an agency publishes a final rule, and the period for challenging that rule passes, people in that industry understand that the agency's policy choice is the law and act accordingly. They make investments because of it. They change their practices because of it. They enter contracts in light of it. They may not like the rule, but they live and work with it, because that is what the Rule of Law requires. It is profoundly destabilizing—and also acutely unfair—to permit newcomers to bring legal challenges that can overturn settled regulations long after the rest of the competitive marketplace has adapted itself to the regulatory environment.

Moreover, as I have explained, the Court's ruling in this case allows for every new entity to challenge any and every rule that an agency has ever adopted. It is extraordinarily presumptuous that an entity formed in full view of an

agency's rules, by founders who can choose to enter the industry or not, can demand that well-established rules of engagement be revisited. But even setting aside those commonsense fairness concerns, the constant churn of potential attacks on an agency's rules by new entrants can harm *all* entities in a regulated industry. At any time, anyone can come along and potentially cause every entity to have to adjust its whole operations manual, since any rule (no matter how well settled) might be subject to alteration. Indeed, the obvious need for stability in the rules that govern an industry is precisely why a defined period for challenging the rules was needed at all.

Knowledgeable *amici* have explained that the majority's approach to accrual of the statute of limitations for APA claims undermines the "[s]tability, predictability, and consistency [that] enable[s] small businesses to survive and thrive." Brief for Small Business Associations as *Amici Curiae* 5. And there is no question that long-term uncertainty "hinders the ability of businesses to plan effectively." *Id.,* at 9. The majority's accrual rule unnecessarily creates "frequent, inconsistent, judicially-driven policy changes that do not involve the sort of careful balancing envisioned in the normal process of regulatory change." *Id.,* at 12. And, again, one might think that preventing such chaos is precisely why Congress enacted a statute of limitations in the first place.

Seeking to minimize the fully foreseeable and potentially devastating impact of its ruling, the majority maintains that there is nothing to see here, because not every lawsuit brought by a new industry upstart will win, and, at any rate, many agency regulations are already subject to challenge. See *ante,* at 21. But this myopic rationalization overlooks other significant changes that this Court has wrought this Term with respect to the longstanding rules governing review of agency actions. The discerning reader will know that the Court has handed down other decisions this Term

that likewise invite and enable a wave of regulatory challenges—decisions that carry with them the possibility that well-established agency rules will be upended in ways that were previously unimaginable. Doctrines that were once settled are now unsettled, and claims that lacked merit a year ago are suddenly up for grabs.

In *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. \_\_\_ (2024), for example, the Court has reneged on a blackletter rule of administrative law that had been foundational for the last four decades. *Id.*, at \_\_\_ (slip op., at 30). Under that prior interpretive doctrine, courts deferred to agency interpretations of ambiguous statutes that Congress authorized the agency to administer. Now, every legal claim conceived of in those last four decades—and before—can possibly be brought before courts newly unleashed from the constraints of any such deference. See Tr. of Oral Arg. 74 (Assistant to the Solicitor General explaining that this result "would magnify the effect of" overruling *Chevron*).

Put differently, a fixed statute of limitations, running from the agency's action, was one barrier to the chaotic upending of settled agency rules; the requirement that deference be given to an agency's reasonable interpretations concerning its statutory authority to issue rules was another. The Court has now eliminated both. Any new objection to any old rule must be entertained and determined *de novo* by judges who can now apply their own unfettered judgment as to whether the rule should be voided.

\*    \*    \*

At the end of a momentous Term, this much is clear: The tsunami of lawsuits against agencies that the Court's holdings in this case and *Loper Bright* have authorized has the potential to devastate the functioning of the Federal Government. Even more to the present point, that result simply cannot be what Congress intended when it enacted legislation that stood up and funded federal agencies and

vested them with authority to set the ground rules for the individuals and entities that participate in our economy and our society. It is utterly inconceivable that §2401(a)'s statute of limitations was meant to permit fresh attacks on settled regulations from all new comers forever. Yet, that is what the majority holds today.

But Congress still has a chance to address this absurdity and forestall the coming chaos. It can opt to correct this Court's mistake by clarifying that the statutes it enacts are designed to facilitate the functioning of agencies, not to hobble them. In particular, Congress can amend §2401(a), or enact a specific review provision for APA claims, to state explicitly what any such rule *must* mean if it is to operate as a limitations period in this context: Regulated entities have six years from the date of the agency action to bring a lawsuit seeking to have it changed or invalidated; after that, facial challenges must end. By doing this, Congress can make clear that lawsuits bringing facial claims against agencies are not personal attack vehicles for new entities created just for that purpose. So, while the Court has made a mess of this pivotal statute, and the consequences are profound, "the ball is in Congress' court." *Ledbetter* v. *Goodyear Tire & Rubber Co.*, 550 U. S. 618, 661 (2007) (Ginsburg, J., dissenting).